# PRESS-ENTERPRISE CO. *v.* SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF RIVERSIDE

No. 84–1560.   Argued February 26, 1986—Decided June 30, 1986

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in Part II of which REHNQUIST, J., joined, *post*, p. 15.

*James D. Ward* argued the cause for petitioner.   With him on the briefs was *Sharon J. Waters.*

*Joyce Ellen Manulis Reikes* argued the cause for respondent. With her on the brief were *Gerald J. Geerlings* and *Glenn Robert Salter. Ephriam Margolin* filed a brief for Diaz, real party in interest.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether petitioner has a First Amendment right of access to the transcript of a preliminary hearing growing out of a criminal prosecution.

I

On December 23, 1981, the State of California filed a complaint in the Riverside County Municipal Court, charging Robert Diaz with 12 counts of murder and seeking the death penalty. The complaint alleged that Diaz, a nurse, murdered 12 patients by administering massive doses of the heart drug lidocaine. The preliminary hearing on the complaint commenced on July 6, 1982. Diaz moved to exclude the public from the proceedings under Cal. Penal Code Ann. §868 (West 1985), which requires such proceedings to be

---

*Briefs of *amici curiae* urging reversal were filed for the State of California by *John K. Van de Kamp,* Attorney General, *Andrea Sheridan Ordin* and *Steve White,* Chief Assistant Attorneys General, and *Marian M. Johnston,* Deputy Attorney General; for the American Civil Liberties Union et al. by *Robert S. Warren, Rex S. Heinke,* and *Charles S. Sims;* for the American Newspaper Publishers Association et al. by *Bruce W. Sanford, Lee Levine, W. Terry Maguire, Richard M. Schmidt, Jr., George A. Vradenburg III, Lawrence Gunnels, Mark L. Tuft, Robert D. Sack, Alice Neff Lucan, E. Susan Garsh, Harvey L. Lipton, Norton L. Armour, Robert J. Brinkmann, Lois J. Schiffer, Samuel E. Klein, Nancy H. Hendry, Jane E. Kirtley, Alexander Wellford, P. Cameron De Vore,* and *Carol D. Melamed;* and for Copley Press, Inc., et al. by *Harold W. Fuson, Jr., Judith R. Epstein, Edward J. McIntyre, William A. Niese, Donald L. Zachary, Mark L. Tuft, Lawrence Gunnels, Robert N. Landes, Kenneth M. Vittor,* and *Jonathan Kotler.*

*Grover C. Trask II, pro se,* filed a brief for the District Attorney, County of Riverside, as *amicus curiae.*

4

open unless "exclusion of the public is necessary in order to protect the defendant's right to a fair and impartial trial."[1] The Magistrate granted the unopposed motion, finding that closure was necessary because the case had attracted national publicity and "only one side may get reported in the media." App. 22a.

The preliminary hearing continued for 41 days. Most of the testimony and the evidence presented by the State was medical and scientific; the remainder consisted of testimony by personnel who worked with Diaz on the shifts when the 12 patients died. Diaz did not introduce any evidence, but his counsel subjected most of the witnesses to vigorous cross-examination. Diaz was held to answer on all charges. At the conclusion of the hearing, petitioner Press-Enterprise

---

[1] Section 868, as amended in 1982, provides in full:

"The examination shall be open and public. However, upon the request of the defendant and a finding by the magistrate that exclusion of the public is necessary in order to protect the defendant's right to a fair and impartial trial, the magistrate shall exclude from the examination every person except the clerk, court reporter and bailiff, the prosecutor and his or her counsel, the Attorney General, the district attorney of the county, the investigating officer, the officer having custody of a prisoner witness while the witness is testifying, the defendant and his or her counsel, the officer having the defendant in custody and a person chosen by the prosecuting witness who is not himself or herself a witness but who is present to provide the prosecuting witness moral support, provided that the person so chosen shall not discuss prior to or during the preliminary examination the testimony of the prosecuting witness with any person, other than the prosecuting witness, who is a witness in the examination. Nothing in this section shall affect the right to exclude witnesses as provided in Section 687 of the Penal Code."

Before 1982, the statute gave the defendant the unqualified right to close the proceedings. After the California Supreme Court rejected a First Amendment attack on the old statute in *San Jose Mercury-News* v. *Superior Court*, 30 Cal. 3d 498, 638 P. 2d 655 (1982), the California Legislature amended the statute to include the present requirement that the hearing be closed only upon a finding by the magistrate that closure is "necessary in order to protect the defendant's right to a fair and impartial trial."

Company asked that the transcript of the proceedings be released. The Magistrate refused and sealed the record.

On January 21, 1983, the State moved in Superior Court to have the transcript of the preliminary hearing released to the public; petitioner later joined in support of the motion. Diaz opposed the motion, contending that release of the transcript would result in prejudicial pretrial publicity. The Superior Court found that the information in the transcript was "as factual as it could be," and that the facts were neither "inflammatory" nor "exciting," but that there was, nonetheless, "a reasonable likelihood that release of all or any part of the transcripts might prejudice defendant's right to a fair and impartial trial." *Id.*, at 60a, 61a.

Petitioner then filed a peremptory writ of mandate with the Court of Appeal. That court originally denied the writ but, after being so ordered by the California Supreme Court, set the matter for a hearing. Meanwhile, Diaz waived his right to a jury trial and the Superior Court released the transcript. After holding that the controversy was not moot, the Court of Appeal denied the writ of mandate.

The California Supreme Court thereafter denied petitioner's peremptory writ of mandate, holding that there is no general First Amendment right of access to preliminary hearings. 37 Cal. 3d 772, 691 P. 2d 1026 (1984). The court reasoned that the right of access to criminal proceedings recognized in *Press-Enterprise Co.* v. *Superior Court*, 464 U. S. 501 (1984) *(Press-Enterprise I)*, and *Globe Newspaper Co.* v. *Superior Court*, 457 U. S. 596 (1982), extended only to actual criminal trials. 37 Cal. 3d, at 776, 691 P. 2d, at 1028. Furthermore, the reasons that had been asserted for closing the proceedings in *Press-Enterprise I* and *Globe*—the interests of witnesses and other third parties—were not the same as the right asserted in this case—the defendant's right to a fair and impartial trial by a jury uninfluenced by news accounts.

Having found no general First Amendment right of access, the court then considered the circumstances in which the clo-

sure would be proper under the California access statute, Cal. Penal Code Ann. § 868 (West 1985). Under the statute, the court reasoned, if the defendant establishes a "reasonable likelihood of substantial prejudice" the burden shifts to the prosecution or the media to show by a preponderance of the evidence that there is no such reasonable probability of prejudice. 37 Cal. 3d, at 782, 691 P. 2d, at 1032.

We granted certiorari. 474 U. S. 899 (1985). We reverse.

## II

We must first consider whether we have jurisdiction under Article III, § 2, of the Constitution. In this Court, petitioner challenges the Superior Court's original refusal to release the transcript of the preliminary hearing. As noted above, the specific relief petitioner seeks has already been granted—the transcript of the preliminary hearing was released after Diaz waived his right to a jury trial. However, as in *Globe Newspaper, supra,* at 603, and *Gannett Co. v. DePasquale,* 443 U. S. 368, 377–378 (1979), this controversy is "'capable of repetition, yet evading review.'" It can reasonably be assumed that petitioner will be subjected to a similar closure order and, because criminal proceedings are typically of short duration, such an order will likely evade review. *Globe* and *Gannett,* therefore, require the conclusion that this case is not moot. Accordingly, we turn to the merits.

## III

It is important to identify precisely what the California Supreme Court decided:

> "[W]e conclude that the magistrate shall close the preliminary hearing upon finding a reasonable likelihood of substantial prejudice which would impinge upon the right to a fair trial. Penal code section 868 makes clear that the primary right is the right to a fair trial and that the public's right of access must give way when there is conflict." 37 Cal. 3d, at 781, 691 P. 2d, at 1032.

It is difficult to disagree in the abstract with that court's analysis balancing the defendant's right to a fair trial against the public right of access. It is also important to remember that these interests are not necessarily inconsistent. Plainly, the defendant has a right to a fair trial but, as we have repeatedly recognized, one of the important means of assuring a fair trial is that the process be open to neutral observers.

The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness. Only recently, in *Waller* v. *Georgia*, 467 U. S. 39 (1984), for example, we considered whether the defendant's Sixth Amendment right to an open trial prevented the closure of a suppression hearing over the defendant's objection. We noted that the First Amendment right of access would in most instances attach to such proceedings and that "the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Id.*, at 46. When the defendant objects to the closure of a suppression hearing, therefore, the hearing must be open unless the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced. *Id.*, at 47.

Here, unlike *Waller*, the right asserted is not the defendant's Sixth Amendment right to a public trial since the defendant requested a *closed* preliminary hearing. Instead, the right asserted here is that of the public under the First Amendment. See *Gannett*, *supra*, at 397 (POWELL, J., concurring). The California Supreme Court concluded that the First Amendment was not implicated because the proceeding was not a criminal trial, but a preliminary hearing. However, the First Amendment question cannot be resolved solely on the label we give the event, *i. e.*, "trial" or otherwise, particularly where the preliminary hearing functions much like a full-scale trial.

In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a "'tradition of accessibility implies the favorable judgment of experience,'" *Globe Newspaper*, 457 U. S., at 605 (quoting *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 589 (1980) (BRENNAN, J., concurring in judgment)), we have considered whether the place and process have historically been open to the press and general public.

In *Press-Enterprise I*, for example, we observed that "since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." 464 U. S., at 505. In *Richmond Newspapers*, we reviewed some of the early history of England's open trials from the day when a trial was much like a "town meeting." In the days before the Norman Conquest, criminal cases were brought before "moots," a collection of the freemen in the community. The public trial, "one of the essential qualities of a court of justice" in England, was recognized early on in the Colonies. There were risks, of course, inherent in such a "town meeting" trial—the risk that it might become a gathering moved by emotions or passions growing from the nature of a crime; a "lynch mob" ambience is hardly conducive to calm, reasoned decision-making based on evidence. Plainly the modern trial with jurors open to interrogation for possible bias is a far cry from the "town meeting trial" of ancient English practice. Yet even our modern procedural protections have their origin in the ancient common-law principle which provided, not for closed proceedings, but rather for rules of conduct for those who attend trials. *Richmond Newspapers, supra,* at 567.

Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. *Globe Newspaper, supra,* at 606. Although many governmental processes operate best under public scrutiny, it takes little

imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly. A classic example is that "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co.* v. *Petrol Stops Northwest,* 441 U. S. 211, 218 (1979). Other proceedings plainly require public access. In *Press-Enterprise I,* we summarized the holdings of prior cases, noting that openness in criminal trials, including the selection of jurors, "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." 464 U. S., at 501.

These considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes. If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. But even when a right of access attaches, it is not absolute. *Globe Newspaper Co.* v. *Superior Court, supra,* at 606. While open criminal proceedings give assurances of fairness to both the public and the accused, there are some limited circumstances in which the right of the accused to a fair trial might be undermined by publicity.[2] In such cases, the trial court must determine whether the situation is such that the rights of the accused override the qualified First Amendment right of access. In *Press-Enterprise I* we stated:

"[T]he presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can

---

[2] Similarly, the interests of those other than the accused may be implicated. The protection of victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding. See *Globe Newspaper Co.* v. *Superior Court,* 457 U. S., at 607–610.

determine whether the closure order was properly entered." 464 U. S., at 510.

## IV

### A

The considerations that led the Court to apply the First Amendment right of access to criminal trials in *Richmond Newspapers* and *Globe* and the selection of jurors in *Press-Enterprise I* lead us to conclude that the right of access applies to preliminary hearings as conducted in California.

First, there has been a tradition of accessibility to preliminary hearings of the type conducted in California. Although grand jury proceedings have traditionally been closed to the public and the accused, preliminary hearings conducted before neutral and detached magistrates have been open to the public. Long ago in the celebrated trial of Aaron Burr for treason, for example, with Chief Justice Marshall sitting as trial judge, the probable-cause hearing was held in the Hall of the House of Delegates in Virginia, the courtroom being too small to accommodate the crush of interested citizens. *United States* v. *Burr*, 25 F. Cas. 1 (No. 14,692) (CC Va. 1807). From *Burr* until the present day, the near uniform practice of state and federal courts has been to conduct preliminary hearings in open court.[3] As we noted in *Gannett*,

---

[3] The vast majority of States considering the issue have concluded that the same tradition of accessibility that applies to criminal trials applies to preliminary proceedings. See, *e. g.*, *Arkansas Television Co.* v. *Tedder*, 281 Ark. 152, 662 S. W. 2d 174 (1983); *Miami Herald Publishing Co.* v. *Lewis*, 426 So. 2d 1 (Fla. 1982); *R. W. Page Corp.* v. *Lumpkin*, 249 Ga. 576, 578–579, 292 S. E. 2d 815, 819 (1982); *Gannett Pacific Corp.* v. *Richardson*, 59 Haw. 224, 580 P. 2d 49, 56 (1978); *State ex rel. Post-Tribune Publishing Co.* v. *Porter Superior Court*, 274 Ind. 408, 412 N. E. 2d 748 (1980); *Ashland Publishing Co.* v. *Asbury*, 612 S. W. 2d 749, 752 (Ky. App. 1980); *Great Falls Tribune* v. *District Court*, 186 Mont. 433, 608 P. 2d 116 (1980); *Keene Publishing Corp.* v. *Cheshire County Superior Court*, 119 N. H. 710, 406 A. 2d 137 (1979); *State* v. *Williams*, 93 N. J. 39, 459 A. 2d 641 (1983); *Westchester Rockland Newspapers* v. *Leggett*, 48 N. Y. 2d 430, 439, 399 N. E. 2d 518, 523 (1979); *Minot Daily News* v. *Holum*, 380 N. W. 2d 347 (N. D. 1986);

several States following the original New York Field Code of Criminal Procedure published in 1850 have allowed preliminary hearings to be closed on the motion of the accused. 443 U. S., at 390–391. But even in these States the proceedings are presumptively open to the public and are closed only for cause shown.[4] Open preliminary hearings, therefore, have been accorded "'the favorable judgment of experience.'" *Globe*, 457 U. S., at 605.

The second question is whether public access to preliminary hearings as they are conducted in California plays a particularly significant positive role in the actual functioning of the process. We have already determined in *Richmond*

---

*State ex rel. Dayton Newspapers, Inc.* v. *Phillips*, 46 Ohio St. 2d 457, 351 N. E. 2d 127 (1976); *Philadelphia Newspapers, Inc.* v. *Jerome*, 478 Pa. 484, 503, 387 A. 2d 425, 434 (1978); *Kearns-Tribune Corp.* v. *Lewis*, 685 P. 2d 515 (Utah 1984); *Herald Assn., Inc.* v. *Ellison*, 138 Vt. 529, 534, 419 A. 2d 323, 326 (1980); *Federated Publications, Inc.* v. *Kurtz*, 94 Wash. 2d 51, 615 P. 2d 440 (1980); *State ex rel. Herald Mail Co.* v. *Hamilton*, 165 W. Va. 103, 267 S. E. 2d 544 (1980); *Williams* v. *Stafford*, 589 P. 2d 322 (Wyo. 1979). Cf. *In re Midland Publishing*, 420 Mich. 148, 173, 362 N. W. 2d 580, 593 (1984) (proceedings leading to a person's indictment have not been open to the public).

Other courts have noted that some pretrial proceedings have no historical counterpart, but, given the importance of the pretrial proceeding to the criminal trial, the traditional right of access should still apply. See, *e. g.*, *Iowa Freedom of Information Council* v. *Wifvat*, 328 N. W. 2d 920 (Iowa 1983); *Minneapolis Star and Tribune Co.* v. *Kammeyer*, 341 N. W. 2d 550 (Minn. 1983); *Richmond Newspapers, Inc.* v. *Commonwealth*, 222 Va. 574, 281 S. E. 2d 915 (1981).

[4] See *State* v. *McKenna*, 78 Idaho 647, 309 P. 2d 206 (1957); *Davis* v. *Sheriff*, 93 Nev. 511, 569 P. 2d 402 (1977). Although Arizona, Iowa, Montana, North Dakota, Pennsylvania, and Utah have closure statutes based on the Field Code, see *Gannett*, 443 U. S., at 391, in each of these States the Supreme Court has found either a common-law or state constititional right of the public to attend pretrial proceedings. See *Phoenix Newspapers, Inc.* v. *Superior Court*, 101 Ariz. 257, 418 P. 2d 594 (1966); *Iowa Freedom of Information Council* v. *Wifvat, supra; Great Falls Tribune* v. *District Court, supra; Minot Daily News* v. *Holum, supra; Commonwealth* v. *Hayes*, 489 Pa. 419, 414 A. 2d 318 (1980); *Kearns-Tribune Corp.* v. *Lewis, supra.*

*Newspapers, Globe,* and *Press-Enterprise I* that public access to criminal trials and the selection of jurors is essential to the proper functioning of the criminal justice system. California preliminary hearings are sufficiently like a trial to justify the same conclusion.

In California, to bring a felon to trial, the prosecutor has a choice of securing a grand jury indictment or a finding of probable cause following a preliminary hearing. Even when the accused has been indicted by a grand jury, however, he has an absolute right to an elaborate preliminary hearing before a neutral magistrate. *Hawkins* v. *Superior Court,* 22 Cal. 3d 584, 586 P. 2d 918 (1978). The accused has the right to personally appear at the hearing, to be represented by counsel, to cross-examine hostile witnesses, to present exculpatory evidence, and to exclude illegally obtained evidence. Cal. Penal Code Ann. §§ 859–866 (West 1985), § 1538.5 (West Supp. 1986). If the magistrate determines that probable cause exists, the accused is bound over for trial; such a finding leads to a guilty plea in the majority of cases.

It is true that unlike a criminal trial, the California preliminary hearing cannot result in the conviction of the accused and the adjudication is before a magistrate or other judicial officer without a jury. But these features, standing alone, do not make public access any less essential to the proper functioning of the proceedings in the overall criminal justice process. Because of its extensive scope, the preliminary hearing is often the final and most important step in the criminal proceeding. See *Waller* v. *Georgia,* 467 U. S., at 46–47. As the California Supreme Court stated in *San Jose Mercury-News* v. *Municipal Court,* 30 Cal. 3d 498, 511, 638 P. 2d 655, 663 (1982), the preliminary hearing in many cases provides "the sole occasion for public observation of the criminal justice system." See also *Richmond Newspapers,* 448 U. S., at 572.

Similarly, the absence of a jury, long recognized as "an inestimable safeguard against the corrupt or overzealous pros-

ecutor and against the compliant, biased, or eccentric judge," *Duncan* v. *Louisiana*, 391 U. S. 145, 156 (1968), makes the importance of public access to a preliminary hearing even more significant. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U. S., at 572.

Denying the transcript of a 41-day preliminary hearing would frustrate what we have characterized as the "community therapeutic value" of openness. *Id.*, at 570. Criminal acts, especially certain violent crimes, provoke public concern, outrage, and hostility. "When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions." *Press-Enterprise I*, 464 U. S., at 509. See also H. Weihofen, The Urge to Punish 130–131 (1956); T. Reik, The Compulsion to Confess (1959). In sum:

> "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise I*, *supra*, at 508 (emphasis in original).

We therefore conclude that the qualified First Amendment right of access to criminal proceedings applies to preliminary hearings as they are conducted in California.

B

Since a qualified First Amendment right of access attaches to preliminary hearings in California under Cal. Penal Code Ann. § 858 *et seq.* (West 1985), the proceedings cannot be closed unless specific, on the record findings are made demonstrating that "closure is essential to preserve higher values

and is narrowly tailored to serve that interest." *Press-Enterprise I, supra,* at 510. See also *Globe Newspaper,* 457 U. S., at 606–607. If the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed only if specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent and, second, reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights. See *Press-Enterprise I, supra; Richmond Newspapers, supra,* at 581.

The California Supreme Court, interpreting its access statute, concluded that "the magistrate shall close the preliminary hearing upon finding a reasonable likelihood of substantial prejudice." 37 Cal. 3d, at 781, 691 P. 2d, at 1032. As the court itself acknowledged, the "reasonable likelihood" test places a lesser burden on the defendant than the "substantial probability" test which we hold is called for by the First Amendment. See *ibid.;* see also *id.,* at 783, 691 P. 2d, at 1033 (Lucas, J., concurring and dissenting). Moreover, that court failed to consider whether alternatives short of complete closure would have protected the interests of the accused.

In *Gannett* we observed:

> "Publicity concerning pretrial suppression hearings such as the one involved in the present case poses special risks of unfairness. The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury. Cf. *Jackson* v. *Denno,* 378 U. S. 368. Publicity concerning the proceedings at a pretrial hearing, however, could influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial." 443 U. S., at 378.

But this risk of prejudice does not automatically justify refusing public access to hearings on every motion to suppress. Through *voir dire,* cumbersome as it is in some circumstances, a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict. And even if closure were justified for the hearings on a motion to suppress, closure of an entire 41-day proceeding would rarely be warranted. The First Amendment right of access cannot be overcome by the conclusory assertion that publicity might deprive the defendant of that right. And any limitation must be "narrowly tailored to serve that interest." *Press-Enterprise I, supra,* at 510.

The standard applied by the California Supreme Court failed to consider the First Amendment right of access to criminal proceedings. Accordingly, the judgment of the California Supreme Court is reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE REHNQUIST joins as to Part II, dissenting.

The constitutional question presented by this case is whether members of the public have a First Amendment right to insist upon access to the transcript of a preliminary hearing during the period before the public trial, even though the accused, the prosecutor, and the trial judge have all agreed to the sealing of the transcript in order to assure a fair trial.

The preliminary hearing transcript to which petitioner sought access consists of 4,239 pages of testimony by prosecution witnesses heard over eight weeks. The testimony, contained in 47 volumes, accuses Mr. Robert Diaz, a nurse, of murdering 12 patients in the hospital in which he worked by injecting them with lethal doses of a heart drug. The transcript reveals that the defense put on no witnesses of its own.

Immediately after the Magistrate ordered the defendant bound over for trial, defense counsel moved that the transcript of the preliminary hearing be sealed to protect his cli-

ent's right to a fair trial. The transcript, in the words of the Magistrate, revealed "only one side of the story." App. 28a. The transcript also contained the Magistrate's characterization of Mr. Diaz as "the most dangerous type of individual there is." Id., at 27a. The prosecutor did not oppose this motion, and the Magistrate, after hearing petitioner's objection, ordered the transcript sealed.

The Superior Court trial judge denied a motion to unseal the transcript. He found—and the finding is amply supported by the record—that "there is a reasonable likelihood that making all or any part of the transcripts public might prejudice the defendant's right to a fair and impartial trial." Id., at 61a. Accord, id., at 62a. The Magistrate had earlier rejected less restrictive alternatives to sealing the transcript, concluding that "the only way to protect" the defendant's "[fair trial] right would be to seal the transcript." Id., at 37a.[1]

The Court of Appeal agreed with the trial judge and denied the peremptory writ of mandate sought by petitioner. It rejected petitioner's assertion that "the superior court failed to state any reasons or make a specific finding to support the sealing order." App. to Pet. for Cert. E–11. Instead, it confirmed the trial judge's determinations that "the transcript is indicative of only the prosecutorial side of the case," id., at E–14; that the public's right of access was overborne by the "reasonable likelihood of substantial prejudice" to "the defendant's right to a fair trial," id., at E–9; and that "[a]lternatives to sealing the transcript would not suffice in this

---

[1] In so ruling, the Magistrate recognized that he had "an affirmative constitutional duty to insure that a defendant has a fair trial," App. 37a, under Gannett Co. v. DePasquale, 443 U. S. 368, 378 (1979) ("To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary" (citation omitted)).

case," *id.*, at E–14.[2]   The California Supreme Court simi-
larly denied petitioner's request for a peremptory writ of
mandate, affirming that a preliminary hearing transcript can
be sealed upon a showing of a "reasonable likelihood of sub-
stantial prejudice which would impinge upon the right to a
fair trial."   37 Cal. 3d 772, 781, 691 P. 2d 1026, 1032 (1984).

In view of the above, the trial judge had an obvious and
legitimate reason for refusing to make the transcript public
any sooner than he did.   His decision plainly did not violate
the defendant's right to a public trial under the Sixth Amend-
ment, for it was the defendant who objected to release of the
transcript.   See *Gannett Co.* v. *DePasquale*, 443 U. S. 368,
383–384 (1979).   In my opinion, the judge's decision did not
violate the First Amendment either.

## I

Although perhaps obvious, it bears emphasis that the First
Amendment right asserted by petitioner is not a right to pub-
lish or otherwise communicate information lawfully or unlaw-
fully acquired.   That right, which lies at the core of the First
Amendment and which erased the legacy of restraints on
publication against which the drafters of that Amendment re-
belled, see *Grosjean* v. *American Press Co.*, 297 U. S. 233,
245–250 (1936), may be overcome only by a governmental ob-
jective of the highest order attainable in a no less intrusive
way.   See, *e. g.*, *Smith* v. *Daily Mail Publishing Co.*, 443
U. S. 97, 101–106 (1979); *Landmark Communications, Inc.*
v. *Virginia*, 435 U. S. 829, 837–845 (1978); *Oklahoma Pub-
lishing Co.* v. *District Court*, 430 U. S. 308, 310–312 (1977)
*(per curiam); Nebraska Press Assn.* v. *Stuart*, 427 U. S.
539, 556–570 (1976); *Cox Broadcasting Corp.* v. *Cohn*, 420
U. S. 469, 487–497 (1975).   The First Amendment right as-

---

[2] Indeed, the Court of Appeal determined that "[t]he release of the tran-
script and employment of these alternatives would tend to *exacerbate* the
existing prejudice."   App. to Pet. for Cert. E–15 (emphasis added and ci-
tation omitted).

serted by petitioner in this case, in contrast, is not the right to publicize information in its possession, but the right to acquire access thereto.

I have long believed that a proper construction of the First Amendment embraces a right of access to information about the conduct of public affairs.

> "As Madison wrote:

> "'A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.' 9 Writings of James Madison 103 (G. Hunt ed. 1910).

> "It is not sufficient, therefore, that the channels of communication be free of governmental restraints. Without some protection for the acquisition of information about the operation of public institutions such as prisons by the public at large, the process of self-governance contemplated by the Framers would be stripped of its substance.

> "For that reason information gathering is entitled to some measure of constitutional protection." *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 31–32 (1978) (STEVENS, J., dissenting).[3]

---

[3] See *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 586–589 (1980) (BRENNAN, J., concurring in judgment); *Saxbe* v. *Washington Post Co.*, 417 U. S. 843, 862–864 (1974) (POWELL, J., dissenting). In a footnote to my separate writing in *Houchins*, I appended a quotation from Justice Stewart's dissenting opinion in *Branzburg* v. *Hayes*, 408 U. S. 665, 728 (1972) (emphasis added), where he stated that "a right to gather news, *of some dimensions*, must exist." The majority agreed with this observation, acknowledging that "news gathering is not without its First Amendment protections," *id.*, at 707, for "without some protection for seeking out the news, freedom of press could be eviscerated," *id.*, at 681. See also *Zemel* v. *Rusk*, 381 U. S. 1, 16–17 (1965) ("The right to speak and publish

Neither our elected nor our appointed representatives may abridge the free flow of information simply to protect their own activities from public scrutiny. An official policy of secrecy must be supported by some legitimate justification that serves the interest of the public office. Thus, in *Pell* v. *Procunier*, 417 U. S. 817 (1974), and *Saxbe* v. *Washington Post Co.*, 417 U. S. 843 (1974), we confirmed that the warden's regulation of prearranged inmate press interviews had a legitimate disciplinary and penological basis and was "not part of an attempt by the State to conceal the conditions in its prisons or to frustrate the press' investigation and reporting of those conditions." *Pell* v. *Procunier*, 417 U. S., at 830. Accord, *Saxbe* v. *Washington Post Co.*, 417 U. S., at 848. Likewise, in *Gannett Co.* v. *DePasquale*, 443 U. S. 368 (1979), we held that any First Amendment access right "was given all appropriate deference by the state *nisi prius* court," *id.*, at 392, which had entered a "finding on the record that an open suppression hearing would pose a 'reasonable probability of prejudice to these defendants,'" *id.*, at 376. Conversely, in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555 (1980), a violation of the First Amendment was established by the "total absence of any record justification for the closure order," *id.*, at 584 (STEVENS, J., concurring). Accord, *id.*, at 580–581 (opinion of BURGER, C. J.). The same constitutional infirmity afflicted the order excluding the public from attending the testimony of minor victims in a sex-offense trial in *Globe Newspaper Co.* v. *Superior Court*, 457 U. S. 596, 608–609 (1982) ("the record indicates that the victims may have been willing to testify despite the presence of the press" (footnote omitted)), and the order closing the *voir dire* proceedings and sealing the transcript in *Press-Enterprise Co.* v. *Superior Court*, 464 U. S. 501, 510–511 (1984) ("prolonged closure was unsupported by findings"); *id.*, at 513 ("trial judge provided no explanation" for his

does not carry with it the *unrestrained* right to gather information" (emphasis added)).

20

"broad order"); *id.*, at 515 (BLACKMUN, J., concurring).   Cf. *Waller* v. *Georgia*, 467 U. S. 39, 48, n. 7, 49, n. 8 (1984).[4]

But it has always been apparent that the freedom to obtain information that the government has a legitimate interest in not disclosing, see *Globe Newspaper Co.* v. *Superior Court*, 457 U. S., at 621 (STEVENS, J., dissenting), is far narrower than the freedom to disseminate information, which is "virtually absolute" in most contexts, *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S., at 582 (STEVENS, J., concurring).   In this case, the risk of prejudice to the defendant's right to a fair trial is perfectly obvious.   For me, that risk is far more significant than the countervailing interest in publishing the transcript of the preliminary hearing sooner rather than later.   Cf. *Gannett Co.* v. *DePasquale*, 443 U. S., at 393 (upholding closure of suppression hearing in part because "any denial of access in this case was not absolute but only temporary").   The interest in prompt publication—in my view—is no greater than the interest in prompt publication of grand jury transcripts.   As explained more fully below, we have always recognized the legitimacy of the governmental interest in the secrecy of grand jury proceedings, and I am unpersuaded that the difference between such proceedings and the rather elaborate procedure for determining probable cause that California has adopted strengthens the First Amendment claim to access asserted in this case.

---

[4] In *Houchins* I explained why I believed that the plaintiffs were entitled to put an end to the warden's policy of concealing prison conditions from the public.   "Those conditions are wholly without claim to confidentiality.   While prison officials have an interest in the time and manner of public acquisition of information about the institutions they administer, there is no legitimate penological justification for concealing from citizens the conditions in which their fellow citizens are being confined."   438 U. S., at 35–36.   It seemed clear that an "official prison policy of concealing such knowledge from the public by arbitrarily cutting off the flow of information at its source abridges the freedom of speech and of the press protected by the First and Fourteenth Amendments to the Constitution." *Id.*, at 38 (footnote omitted).

## II

The Court nevertheless reaches the opposite conclusion by applying the "two complementary considerations," *ante*, at 8, of "experience and logic," *ante*, at 9. In my view, neither the Court's reasoning nor the result it reaches is supported by our precedents.

The historical evidence proffered in this case is far less probative than the evidence adduced in prior cases granting public access to criminal proceedings. In those cases, a common-law tradition of openness at the time the First Amendment was ratified suggested an intention and expectation on the part of the Framers and ratifiers that those proceedings would remain presumptively open. Thus, in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S., at 564, THE CHIEF JUSTICE explained that "[w]hat is significant for present purposes is that throughout its evolution, the trial has been open to all who cared to observe." "[T]he historical evidence demonstrates conclusively that *at the time when our organic laws were adopted*, criminal trials both here and in England had long been presumptively open." *Id.*, at 569 (emphasis added). History was relevant because it demonstrated that "[t]he Bill of Rights was enacted against the backdrop of the long history of trials being presumptively open. Public access to trials was then regarded as an important aspect of the process itself." *Id.*, at 575. The opinion for the Court in *Globe Newspaper Co.* v. *Superior Court*, 457 U. S., at 605, which also concerned the presumptive openness of a criminal trial, relied expressly on the opinion of THE CHIEF JUSTICE in *Richmond Newspapers* for the point that criminal trials were open "at the time when our organic laws were adopted." 448 U. S., at 569. Later, in *Press-Enterprise Co.* v. *Superior Court*, the Court quoted the identical passage from *Richmond Newspapers*, see 464 U. S., at 505, and concluded that "[p]ublic jury selection thus was the common practice in America when the Constitution was

adopted," *id.*, at 508. To dispel any doubt regarding the significance of this evidence, we explained that "the question we address—whether the *voir dire* process must be open—focuses on First . . . Amendment values *and the historical backdrop against which the First Amendment was enacted.*" *Id.*, at 509, n. 8 (emphasis added). Thus, in our prior cases history mattered primarily for what it revealed about the intentions of the Framers and ratifiers of the First Amendment.

In this case, however, it is uncontroverted that a common-law right of access did not inhere in preliminary proceedings at the time the First Amendment was adopted, and that the Framers and ratifiers of that provision could not have intended such proceedings to remain open. As Justice Stewart wrote for the Court in *Gannett Co.* v. *DePasquale:*

> "[T]here exists no persuasive evidence that at common law members of the public had any right to attend pretrial proceedings; indeed, there is substantial evidence to the contrary. By the time of the adoption of the Constitution, . . . pretrial proceedings, precisely because of the . . . concern for a fair trial, were never characterized by the same degree of openness as were actual trials.
>
> "Under English common law, the public had no right to attend pretrial proceedings. *E. g.,* E. Jenks, The Book of English Law 75 (6th ed. 1967) ('It must, of course, be remembered, that the principle of publicity only applies to the actual trial of a case, not necessarily to the preliminary or prefatory stages of the proceedings . . .'); F. Maitland, Justice and Police 129 (1885) (The 'preliminary examination of accused persons had gradually assumed a very judicial form . . . . The place in which it is held is indeed no "open court," the public can be excluded if the magistrate thinks that the ends of justice will thus be best answered . . .'). See also Indictable Offences Act, 11 & 12 Vict., ch. 42, § 19 (1848) (pro-

viding that pretrial proceedings should not be deemed an open court and that the public could therefore be excluded); Magistrates' Courts Act, 15 & 16 Geo. 6 & 1 Eliz. 2, ch. 55, § 4(2) (1952) (same)." 443 U. S., at 387–389 (footnotes omitted).[5]

Justice Stewart included in his discussion the following quotation from Lord Ellenborough; the Law Lord explains, in reasons as relevant today as they were when the Bill of Rights was adopted, the historical basis for the closure of preliminary proceedings:

> "If any thing is more important than another in the administration of justice, it is that jurymen should come to the trial of those persons on whose guilt or innocence they are to decide, with minds pure and unprejudiced. . . . Trials at law fairly reported, although they may occasionally prove injurious to individuals, have been held to be privileged. Let them continue so privileged. . . . But these preliminary examinations have no such privilege. Their only tendency is to prejudge those whom the law still presumes to be innocent, and to poison the sources of justice." *King* v. *Fisher*, 2 Camp. 563, 570–571, 170 Eng. Rep. 1253, 1255 (N. P. 1811).

In the final analysis, the Court's lengthy historical disquisition demonstrates only that in many States preliminary proceedings are generally open to the public. See *ante*, at 10–11, n. 3. In other States, numbering California and Michigan among them, see *In re Midland Publishing Co.,*

---

[5] Accord, Geis, Preliminary Hearings and the Press, 8 UCLA L. Rev. 397, 406 (1961) ("Preliminary hearings in the American colonies closely followed the prescriptions of the sixteenth-century English statutes" (footnote omitted)). THE CHIEF JUSTICE pointed out in his concurring opinion in *Gannett* that "[a]t common law there was a very different presumption [*i. e.*, in favor of closure] for proceedings which preceded the trial." 443 U. S., at 394. "[N]o one ever suggested that there was any 'right' of the public to be present at such pretrial proceedings as were available in that time [that the Bill of Rights was adopted]." *Id.*, at 396.

420 Mich. 148, 162, 172–174, 362 N. W. 2d 580, 588, 593–594 (1984), such proceedings have been closed.[6] To paraphrase the Court's analysis in *McMillan* v. *Pennsylvania*, 477 U. S. 79, 90 (1986) (footnote omitted), "the fact that the States" have adopted different rules regarding the openness of preliminary proceedings "is merely a reflection of our federal system, which demands '[t]olerance for a spectrum of state procedures dealing with a common problem of law enforcement,' *Spencer* v. *Texas*, 385 U. S. 554, 566 (1967). That [California's] particular approach has been adopted in few other States does not render [its] choice unconstitutional."

---

[6] Ironically, California and Michigan are both States in which preliminary proceedings are generally open to the public, and are thus—surprisingly—part of the recent common-law trend in favor of openness relied on by the Court. It is only on the facts of record in this case that the California courts ordered the transcript sealed. Since many—if not most—of the state-court decisions collected by the Court hold that the right to a public preliminary hearing is personal to the accused, see, *e. g.*, *State* v. *Porter Superior Court*, 274 Ind. 408, 409–410, 412 N. E. 2d 748, 750 (1980); *Azbill* v. *Fisher*, 84 Nev. 414, 419, 442 P. 2d 916, 918–919 (1968), or, more commonly, that it is overcome by a showing of potentially prejudicial publicity equivalent to or less than that required in California, see, *e. g.*, *State* v. *Burak*, 37 Conn. Supp. 627, 630, 431 A. 2d 1246, 1248 (1981) ("likelihood of prejudice"); *United States* v. *Edwards*, 430 A. 2d 1321, 1345 (D. C. 1981) ("likelihood"), cert. denied, 455 U. S. 1022 (1982); *Gannett Pacific Corp.* v. *Richardson*, 59 Haw. 224, 233, 580 P. 2d 49, 56 (1978) ("substantial likelihood"); *Westchester Rockland Newspapers* v. *Leggett*, 48 N. Y. 2d 430, 442, 399 N. E. 2d 518, 525 (1979) ("strong likelihood"); *Kearns-Tribune Corp.* v. *Lewis*, 685 P. 2d 515, 523 (Utah 1984) ("'realistic likelihood of prejudice'"); *Richmond Newspapers, Inc.* v. *Commonwealth*, 222 Va. 574, 589, 281 S. E. 2d 915, 923 (1981) ("likelihood"); *Federated Publications, Inc.* v. *Kurtz*, 94 Wash. 2d 51, 62, 615 P. 2d 440, 446 (1980) ("likelihood of jeopardy"), courts in these States would presumably have also denied access if presented with the facts of this case. On this observation, and in view of the fact that the reasoning of the state courts is heavily dependent on this Court's cases granting access to criminal proceedings (even if they are ultimately grounded in state law), it is remarkable that the Court finds any historical basis for a public right of access to preliminary proceedings on a showing in excess of that required in California and met by the defendant in this case.

As Justice Stewart admonished: we must not "confus[e] the existence of a constitutional right with the common-law tradition of open . . . proceedings." *Gannett Co.* v. *DePasquale*, 443 U. S., at 389, n. 19. The recent common-law developments reported by the Court are relevant, if at all, only insofar as they suggest that preliminary proceedings merit the "beneficial effects of public scrutiny." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S., at 492. The Court's historical crutch cannot carry the weight of opening a preliminary proceeding that the State has ordered closed; that determination must stand or fall on whether it satisfies the second component of the Court's test.

If the Court's historical evidence proves too little, the "'value of openness,'" *ante*, at 13 (quoting *Press-Enterprise Co.* v. *Superior Court*, 464 U. S., at 508), on which it relies proves too much, for this measure would open to public scrutiny far more than preliminary hearings "as they are conducted in California" (a comforting phrase invoked by the Court in one form or another more than eight times in its opinion).[7] In brief, the Court's rationale for opening the "California preliminary hearing" is that it "is often the final and most important step in the criminal proceeding"; that it provides "'the sole occasion for public observation of the criminal justice system'"; that it lacks the protective pres-

---

[7] Given the Court's focus on the history of preliminary proceedings in general, and its reliance on the broad values served by openness, see *ante*, at 13, I do not see the relevance of the fact that preliminary proceedings in California bear an outward resemblance to criminal trials. To the extent that it matters that in California "[t]he accused has the right to personally appear at the hearing, to be represented by counsel, to cross-examine hostile witnesses, to present exculpatory evidence, and to exclude illegally obtained evidence," *ante*, at 12 (citing Cal. Penal Code Ann. §§ 859–866 (West 1985), § 1538.5 (West 1982)), it bears mention that many other States have reformed their grand juries to include one or more of these procedural reforms, see W. LaFave & J. Israel, Criminal Procedure § 15.2(b) (1984). After today's decision, one can only wonder whether the public enjoys a right of access to any or all of these proceedings as well.

ence of a jury; and that closure denies an outlet for community catharsis. *Ante*, at 12, 13 (quotation omitted). The obvious defect in the Court's approach is that its reasoning applies to the traditionally secret grand jury with as much force as it applies to California preliminary hearings. A grand jury indictment is just as likely to be the "final step" in a criminal proceeding and the "sole occasion" for public scrutiny as is a preliminary hearing. Moreover, many critics of the grand jury maintain that the grand jury protects the accused less well than does a legally knowledgeable judge who personally presides over a preliminary hearing. See *Hawkins* v. *Superior Court*, 22 Cal. 2d 584, 590, 586 P. 2d 916, 919–920 (1978) (holding deprivation of preliminary hearing to constitute a denial of equal protection under State Constitution in part because " 'the grand jury is the total captive of the prosecutor who, if he is candid, will concede that he can indict. anybody, at any time, for almost anything, before any grand jury' " (quoting Campbell, Eliminate the Grand Jury, 64 J. Crim. L. & C. 174 (1973))). Finally, closure of grand juries denies an outlet for community rage. When the Court's explanatory veneer is stripped away, what emerges is the reality that the California preliminary hearing is functionally identical to the traditional grand jury. As THE CHIEF JUSTICE emphasized by his quotation of *Cox* v. *Coleridge*, 1 B. & C. 37, 49–50, 107 Eng. Rep. 15, 19–20 (1822), in his concurring opinion in *Gannett Co.* v. *DePasquale*, 443 U. S., at 395, n. (emphasis added):

> " 'It [the proceeding] is only a preliminary inquiry, whether there be sufficient ground to commit the prisoner for trial. The proceeding before the grand jury is *precisely of the same nature, and it would be difficult, if the right exists in the present case, to deny it in that.* This being only a preliminary inquiry, and not a trial, makes, in my mind, all the difference.' "

The Court's reasoning—if carried to its logical outcome—thus contravenes the "long-established policy that maintains

the secrecy of the grand jury proceedings in the federal courts" and in the courts of 19 States. *United States* v. *Procter & Gamble Co.*, 356 U. S. 677, 681 (1958). "Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings." *Branzburg* v. *Hayes*, 408 U. S. 665, 684–685 (1972). This Court has previously described grand jury secrecy as "indispensable," *United States* v. *Johnson*, 319 U. S. 503, 513 (1943), and has remarked that "'the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings,'" *United States* v. *Sells Engineering, Inc.*, 463 U. S. 418, 424 (1983) (quoting *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U. S. 211, 218 (1979)).[8]

In fact, the logic of the Court's access right extends even beyond the confines of the criminal justice system to encompass proceedings held on the civil side of the docket as well. As Justice Stewart explained:

> "If the existence of a common-law rule were the test for whether there is a Sixth Amendment public right to a public trial, therefore, there would be such a right in civil as well as criminal cases. . . . In short, there is no principled basis upon which a public right of access to ju-

---

[8] Five reasons are commonly given for the policy of grand jury secrecy:

" '(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.'" *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U. S., at 219, n. 10 (quoting *United States* v. *Rose*, 215 F. 2d 617, 628–629 (CA3 1954)); *United States* v. *Procter & Gamble Co.*, 356 U. S. 677, 681, n. 6 (1958) (same). See *Illinois* v. *Abbott & Associates, Inc.*, 460 U. S. 557, 566–567, n. 11 (1983).

dicial proceedings can be limited to criminal cases if the scope of the right is defined by the common law rather than the text and structure of the Constitution.

"Indeed, many of the advantages of public criminal trials are equally applicable in the civil trial context. . . . Thus, in some civil cases the public interest in access, and the salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases." *Gannett Co.* v. *DePasquale,* 443 U. S., at 386–387, n. 15.

Cf. *Seattle Times Co.* v. *Rhinehart,* 467 U. S. 20, 29–37 (1984) (newspaper not allowed to publish information to which it was privy as a litigant in a civil action). Despite the Court's valiant attempt to limit the logic of its holding, the *ratio decidendi* of today's decision knows no bounds.

By abjuring strict reliance on history and emphasizing the broad value of openness, the Court tacitly recognizes the importance of public access to government proceedings generally. Regrettably, the Court has taken seriously the stated requirement that the sealing of a transcript be justified by a "compelling" or "overriding" governmental interest and that the closure order be "'narrowly tailored to·serve that interest.'" *Ante,* at 9 (quoting *Press-Enterprise Co.* v. *Superior Court,* 464 U. S., at 501); *Press-Enterprise Co.* v. *Superior Court,* 464 U. S., at 510 (quoting *Globe Newspaper Co.* v. *Superior Court,* 457 U. S., at 607). See *ante,* at 13–14. This standard—as well as the two-part test of history and logic that formed the basis for the decision today—originated as two "helpful principles" in JUSTICE BRENNAN's eloquent concurrence in *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S., at 589. That concurrence recognized that "'[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow,'" *id.,* at 588 (quoting *Zemel* v. *Rusk,* 381 U. S. 1, 16–17 (1965)), and—in contrast with the decision today—stressed that "[a]n assertion of the prerogative to gather information must accordingly be assayed by considering the information sought

and the opposing interests invaded," 448 U. S., at 588 (footnote omitted)—a determination "as much a matter of sensitivity to practical necessities as . . . of abstract reasoning," *ibid.* The cases denying access have done so on a far lesser showing than that required by a compelling governmental interest/least restrictive means analysis, see *supra*, at 19–20, and cases granting access have recognized as legitimate grounds for closure interests that fall far short of those traditionally thought to be "compelling," see *Press-Enterprise Co.* v. *Superior Court*, 464 U. S., at 511–512 (privacy interest of venirepersons sufficient reason to close presumptively open *voir dire* proceeding); see also *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S., at 600 (Stewart, J., concurring in judgment).

The presence of a legitimate reason for closure in this case requires an affirmance. The constitutionally grounded fair trial interests of the accused if he is bound over for trial, and the reputational interests of the accused if he is not, provide a substantial reason for delaying access to the transcript for at least the short time before trial. By taking its own verbal formulation seriously, the Court reverses —without comment or explanation or any attempt at reconciliation—the holding in *Gannett* that a "reasonable probability of prejudice" is enough to overcome the First Amendment right of access to a preliminary proceeding. It is unfortunate that the Court neglects this opportunity to fit the result in this case into the body of precedent dealing with access rights generally. I fear that today's decision will simply further unsettle the law in this area.

I respectfully dissent.