ROTH, Circuit Judge,
dissenting:
The use, of arbitration as a method of resolving business and commercial disputes has been increasing both here and abroad. For example, the caseload of the American Arbitration Association’s International Center for Dispute Resolution grew by almost 330 per cent between.1994 and 2004.[1] The number of requests for arbitration in the London Court of International Arbitration grew by 300 per cent in the last decade.[2]
There are a number of factors that have caused this growth in arbitration. One is the importance of resolving disputes expeditiously. Businesses in this country and abroad need to get commercial conflicts resolved as quickly as possible so that commercial relations are not disrupted. Another factor in the growth of arbitration is the increase in commercial disputes between businesses located in different countries. In particular, non-U.S. companies, with no familiarity — or with too much familiarity — with the American judicial system, may prefer arbitration with the rules set by the parties to lengthy and expensive court proceedings. In addition, arbitration permits the proceedings to be kept confidential, protecting trade secrets and sensitive financial information. The Supreme Court has summarized these advantages as follows:
The point of affording parties' discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute. It can be specified, for example, that the decisionmaker be a specialist in the réle *524 vant field, or that proceedings be kept confidential to protect trade secrets. And the informality of arbitral proceedings is itself desirable, reducing the cost and increasing the speed of dispute resolution.
AT&T Mobility LLC v. Concepcion, — U.S. -, 131 S.Ct. 1740, 1749, 179 L.Ed.2d 742 (2011).
The State of Delaware has become interested in sponsoring arbitration as a part of its efforts to preserve its position as the leading state for incorporations in the U.S. One of the reasons that Delaware has maintained this position is the Delaware Court of Chancery, where the judges are experienced in corporate and business law and readily available to resolve this type of dispute. Nevertheless, judicial proceedings in the Court of Chancery are more formal, time consuming and expensive than arbitration proceedings. For that reason, the Court of Chancery, as a formal adjudicator of disputes, may not be able to compete with the new arbitration systems being set up in other states and countries.[3]
In order to prevent the diversion elsewhere of complex business and corporate cases, the Delaware Legislature in 2009 enacted legislation to create an arbitration system. The Legislature established the arbitral system in the Court of Chancery where the judges are the most experienced in corporate and business litigation. The Legislature declared that the new system was “intended to preserve Delaware’s preeminence in offering cost-effective options for resolving disputes, particularly those involving commercial, corporate, and technology matters.” H.B. 49, 145th Gen. Assem. (Del.2009).
This Delaware arbitration system is offered to business entities (at least one of which must have been formed or organized under Delaware law; no party can be a consumer) to resolve expensive and complex disputes (for disputes involving solely monetary damages, the amount in controversy must be at least $1,000,000) with the consent of the parties. The arbitrators are judges of the Court of Chancery or others authorized under the Rules of the Court of Chancery. The proceedings are confidential. In my view, such a set-up creates a perfect model for commercial arbitration.
Judge Sloviter urges, however, that the Delaware system violates the First Amendment of the U.S. Constitution. Maj. at 521. In arriving at this conclusion, she does not rely solely on either the history of arbitration or the history of civil trials. She looks “ ‘not to the practice of the specific public institution involved, but rather to whether the particular type of government proceeding [has] historically been open in our free society’.” Maj. at 515 (quoting PG Publ’g Co. v. Aichele, 705 F.3d 91, 108 (3d Cir.2013) (quoting Capital *525 Cities Media, Inc. v. Chester, 797 F.2d 1164, 1175 (3d Cir.1986) (en banc))) (alterations in original).[4] She classifies that “particular type of government proceeding,” which would occur in the Delaware arbitration system, as one that has traditionally been open to the public. Maj. at 515. In my view, her analysis begs the question.
On the other hand, Judge Fuentes, while concurring with Judge Sloviter, is less broad in his conclusion. His concern is with the confidentiality of the proceedings. He concludes that the confidentiality provisions of 10 Del. C. § 349(b) violate the First Amendment right of public access and cannot stand. He also concludes that the confidentiality provisions for docketing and holding hearings found in Chancery Court Rules 97(a)(4) and 98(b) violate the First Amendment. However, Judge Fuentes finds most of the statute and rules to be acceptable. He has no problem with a sitting judge arbitrating business disputes. He has no problem with the self-executing aspect of the arbitral awards.
I do not agree with Judge Fuentes’s contention that the Delaware Court of Chancery’s arbitration proceedings cannot be confidential. Confidentiality is one of the primary reasons why litigants choose arbitration to resolve disputes — particularly commercial disputes, involving corporate earnings and business secrets. See 1 Bette J. Roth et al., The Alternative Dispute Resolution Practice Guide 7:12 (2013).
In this dissent, I will focus on the issue of confidentiality because that is the only area in which Judge Fuentes and I differ. I will not discuss the other issues raised by Judge Sloviter although I could, if necessary, respond to those also. I will limit my discussion to the difference between Judge Fuentes’s views and my own.
An examination of confidentiality in arbitration should begin in colonial times. The tradition of arbitration in England and the American colonies reveals a focus on privacy. See Michael Collins, Privacy and Confidentiality in Arbitration Proceedings, 30 Tex. Int’l L.J. 121, 122 (1995) (“In English law ... it has for centuries been recognized that arbitrations take place in private.”); Amy J. Schmitz, Untangling the Privacy Paradox in Arbitration, 545 U. Kan. L.Rev. 1211, 1223 (2006) (“The New York Chamber of Commerce ... established an arbitral regime at the Chamber’s inception in 1765.... [and] relied on arbitration’s privacy and independence to foster efficient resolution of disputes among the American and British merchants during and after the American Revolutionary War.”).[5] In the twentieth century, the modern arbitration bodies began to develop rules for arbitration proceedings that emphasize privacy and confidentiality. See Richard C. Reuben, Confidentiality in Arbitration: Beyond the Myth, 54 U. Kan. L.Rev. 1255,1271-72 (2006).
Today, the major national and international arbitral bodies continue to emphasize confidentiality. Their rules provide that arbitration proceedings are not open to the public unless the parties agree they will be. See, e.g., AAA & ABA, Code of *526 Ethics for Arbitrators in Commercial Disputes, Canon VI(B) (2004); AAA Commercial Arbitration Rules R-23 (2009); UNCI-TRAL, Arbitration Rules art. 21(3) (2010). Thus, as a rule, arbitration has not “historically been open to the press and the general public.” Press II, 478 U.S. at 8, 106 5.Ct. 2735.[6]
With this history of arbitration in mind, looking at experience and logic, see Press-Enterprise Co. v. Superior Court of Calif. for the Cnty. of Riverside, 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), I conclude that, historically, arbitration has been private and confidential. Logically, the resolution of complex business disputes, involving sensitive financial information, trade secrets, and technological developments, needs to be confidential so that the parties do not suffer the ill effects of this information being set out for the public — and especially competitors — to misappropriate. For these reasons, there is here no First Amendment right of public access.
In conclusion, then, it appears to me to be very clear that, when the State of Delaware decided to create its arbitration system, it was looking at traditional arbitration, in a confidential setting, before arbitrators experienced in business and corporate litigation. Delaware did not intend the arbitration system to supplant civil trials. Delaware did not intend to preclude the public from attending proceedings that historically have been open to the public. The new system was created to provide arbitration in Delaware to businesses that consented to arbitration — and that would go elsewhere if Delaware did not offer arbitration before experienced arbitrators in a confidential setting.
For the above reasons, I respectfully dissent. I would reverse the judgment of the District Court and uphold the statute and rules which establish the Delaware arbitration system.

. Loukas Mistelis, International Arbitration— Corporate Attitudes and Practices — 12 Perceptions Tested: Myths, Data and Analysis Research Report, 15 Am. Rev. Int’l Arb. 525, 527 (2004).

. Compare London Court of International Arbitration's Director General’s Report for 2001 with the Director General’s Reports for. 2010 and-2011, available at http://www.lcia.org/ LCIA/Casework_Report.aspx.

. See N.Y. State Bar Ass’n, Task Force on N.Y. Law in Int’l Matters, Final Report 4 (June 25, 2011) ('[Jurisdictions around the world, many with government support, are taking steps to increase their arbitration case load. New arbitration laws were enacted in 2010 and 2011 in France, Ireland, Hong Kong, Scotland, Ghana and other nations to enhance their attractiveness as seats of arbitration. ... In 2010, at least three jurisdictions established specialized courts to handle international arbitration matters — Australia, India and Ireland. Several other jurisdictions well-known for international arbitration, including France, the United Kingdom, Switzerland, Sweden and China, have designated certain courts or judges to hear cases to challenge or enforce arbitration awards. Among the cited reasons for this focus on arbitration is the governments' recognition of the importance of arbitration to their economies and to their position in toady’s world of global commerce.'); id. at 38, available at http://www. nysba.org/workarea/DownloadAsset.aspx?id= 34027.

. I believe that Judge Sloviter does not appreciate the difference between adjudication and arbitration, i.e., that a judge in a judicial proceeding derives her authority from the coercive power of the state while a judge serving as an arbitrator derives her authority from the consent of the parties.

. The majority asserts that some early arbitrations took place in public. While this may be true, arbitrations even during this period were overwhelmingly private. See, e.g., Michael Collins, Privacy and Confidentiality in Arbitration Proceedings, 30 Tex. Int’l L.J. 121, 122 (1995). -

. Judge Sloviter states that the "closure of private arbitrations is only of questionable relevance." Maj. at 518 n. 2. I disagree. The development of private arbitration is key to understanding the functions of arbitration as a dispute resolution process and its tradition concerning public access and confidentiality.