KELLY, Circuit Judge, concurring.
 

 Given the en banc opinion in
 
 Zink
 
 ,
 
 783 F.3d at 1111-13
 
 , I concur in the court's opinion.
 
 [3]
 
 As the court notes, quoting
 
 Zink
 
 , "we have not ruled that an execution constitutes the kind of criminal proceeding to which the public enjoys a qualified right of access under the First Amendment." But in that case, we proceeded to assume for the sake of analysis that
 
 Press-Enterprise
 
 applied to executions, and concluded the prisoners in that case failed "to state a claim for a qualified right of public access."
 
 783 F.3d at 1112
 
 .
 

 Under
 
 Press-Enterprise
 
 , a right of public access attaches if (1) "the place and process have historically been open to the press and general public," and (2) "public access plays a significant positive role in the functioning of the particular process in question."
 
 478 U.S. at 8-9
 
 ,
 
 106 S.Ct. 2735
 
 . In
 
 Zink
 
 , the court reasoned-under the first prong of the
 
 Press-Enterprise
 
 test-that there is no "qualified right of public access to information regarding the source of the compounded pentobarbital" because there was no "history of openness to the general public."
 
 783 F.3d at 1112-13
 
 ("[T]he prisoners have not alleged facts or cited authority establishing that the particulars of execution methods have historically been open to the press and general public." (quotation omitted)). But there is authority that executions have, historically, been carried out in the public eye and their methods and means have been discussed in the public sphere.
 
 See
 
 John D. Bessler,
 
 Televised Executions and the Constitution: Recognizing a First Amendment Right of Access to State Executions
 
 , 45 Fed. Com. L.J. 355, 359-360 (1993);
 
 cf.
 

 Cal. First Amend. Coal. v. Woodford
 
 ,
 
 299 F.3d 868
 
 , 875-76 (9th Cir. 2002) ("When executions were moved out of the public fora and into prisons, the states implemented procedures that ensured executions would remain open to some public scrutiny. ... Thus, there is a tradition of at least limited public access to executions."). Were this issue before the court in the first instance, I believe there would be support for the conclusion that the historical prong of the
 
 Press-Enterprise
 
 test is satisfied in this context.
 

 Turning to the second
 
 Press-Enterprise
 
 prong, in
 
 Zink
 
 , the court noted that the complaint did not allege that "public access to detailed information about execution protocols plays a significant positive role in the functioning of the process in question, given that the practical effect of public disclosure would likely be frustration of the State's ability to carry out lawful sentences."
 
 783 F.3d at 1113
 
 . The court here similarly states, "public access to the documents in the instant case would not play a significant positive role in the function of Missouri's execution protocol; it would effectively eviscerate the State's ability to carry out executions by jeopardizing its ability to have medical professionals on the execution team." And, indeed,
 
 Press-Enterprise
 
 did recognize that "there are some kinds of government operations that would be totally frustrated if conducted openly," such as grand jury proceedings, the secrecy of which are vital to the criminal justice system itself.
 
 478 U.S. at 9
 
 ,
 
 106 S.Ct. 2735
 
 . But, in my view, the methods and means of carrying out of a criminal sentence-a sentence already made public through a trial accessible to the public-do not fall in that category. In
 
 Press-Enterprise
 
 the Court held that public access to a pre-trial preliminary hearing in a criminal case played a "significant positive role," reasoning that: "Criminal acts, especially certain violent crimes, provoke public concern, outrage, and hostility. When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions."
 

 Id.
 

 at 13
 
 ,
 
 106 S.Ct. 2735
 
 (quotation omitted). "Openness ... enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."
 

 Id.
 

 (quotation omitted). It is difficult to envision an aspect of the criminal justice system where the benefits of public engagement, public awareness, and public confidence are more clear than
 where the state is attempting to enforce the ultimate penalty of death.
 
 [4]
 

 I also concur in the court's determination that the procedure the district court followed for assessing the possibility of redaction was permissible, but I question whether Flynt "did not object in a timely manner." According to the district court, the defendants "ask[ed] for permission to either (1) participate in an
 
 ex parte
 
 and
 
 in camera
 
 hearing or (2) file a redacted explanation in the public file, and provide a non-redacted explanation to the [c]ourt for
 
 in camera
 
 review." The district court "opt[ed] for the latter course" and ordered the filing of supplemental briefing. Given the two options presented, it is not clear that the district court's order allowing the filing of a supplemental brief for "
 
 in camera
 
 review" put Flynt on notice that he-as opposed to the general public-would not have access to the filing. Nevertheless, I see no prejudice to Flynt as a result of any failure of notice, and therefore concur in affirming the district court's denial of Flynt's request to review the supplemental briefing.
 

 If a qualified First Amendment right were to extend to the procedures involved in enforcing a death sentence, it would still be necessary to determine, in this case, whether the sealing of the documents at issue is nonetheless "essential to preserve higher values and is narrowly tailored to serve that interest."
 

 Id.
 

 at 9-10, 13-14
 
 ,
 
 106 S.Ct. 2735
 
 .