**B.H., C.H., J.E., C.Z., E.G., O.G., S.G., C.G., P.G., A.G., Plaintiffs,**

v.

**Sterline M. RYDER, Director of the Illinois Department of Children and Family Services, Defendant.**

No. 88 C 5599.

United States District Court, N.D. Illinois, Eastern Division.

May 2, 1994.

Patrick T. Murphy, Cook County Public Guardian, Chicago, IL, for moving non-party.

Michael L. Brody, Schiff, Hardin & Waite, Benjamin S. Wolf, Roger Baldwin Foundation American Civ. Liberties Union, Chicago, IL, for plaintiffs.

Christina M. Tchen, Skadden, Arps, Slate Meagher & Flom, Chicago, IL, for defendant.

### MEMORANDUM OPINION

GRADY, District Judge.

A consent decree was entered in this case on December 20, 1991. A motion by nonparties (Patrick T. Murphy, individually and as Cook County Public Guardian, and others) now presents a question of public access to court proceedings concerning enforcement of the decree.

The case is a class action brought under 42 U.S.C. § 1983 on behalf of all abused and neglected children in the State of Illinois who come into the custody of the Illinois Department of Children and Family Services ("DCFS" or "Department"). The plaintiff class, then consisting of more than 20,000 children, alleged that while in DCFS custody they were experiencing serious detriment to their physical, mental and emotional development because of the inadequate care afforded by DCFS. This court held that plaintiffs had stated constitutional and statutory claims, *B.H. v. Johnson,* 715 F.Supp. 1387 (N.D.Ill. 1989), and the parties began their preparations for trial. In a series of pretrial conferences, it became apparent to the court that there was no substantial disagreement over plaintiffs' entitlement to the general kind of relief they sought. What separated the parties was a variety of disagreements over the best ways to provide the necessary services. Further conferences in chambers finally resulted in basic agreement as to what kinds of systemic reforms would be appropriate and feasible. After public hearings at which a number of witnesses testified, the 69–page consent decree was entered.

That, as it has turned out, was the easy part. Anticipating that there would be implementation problems, the decree provided for the appointment of a Monitor to oversee the process and to report to the court from time to time. At the request of both sides, the court appointed as Monitor the Honorable Joseph Schneider, retired Chief Judge of the Juvenile Court of Cook County. The Monitor has now filed several reports indicating that, despite considerable efforts, the Department is not living up to many of the deadlines set by the decree for various reforms and is falling short in a number of other ways. The Department has filed responses to the Monitor's reports, disputing many of his conclusions, and plaintiffs have submitted their own written replies to the submissions of the Monitor and the Department. The decree requires the Department to file an Annual Plan, "describing in detail the specific actions the Department will undertake during the next fiscal year and setting forth the actions taken to date to comply with the Implementation Plan and this Decree." Decree, ¶ 70. The Annual Plan provided by the Department on April 1, 1994, is 317 pages in length. All of these written submissions of the parties and the Monitor are made public.

Since entering the decree, the court has held periodic status conferences in open court to discuss compliance questions. Members of the press and other interested per-

sons have been present. The colloquy at these status conferences has usually been adversarial and often heated. Counsel for the plaintiffs is generally accusatory and counsel for the Department defensive. Neither side is inclined to concede anything, and this reluctance, in the court's view, is at least partly based on concern about how a concession would look in the press reports. (The status conferences have always been reported in the press the following day, and there is no question that the Department's efforts to deal with its increasing caseload of abused and neglected children is a matter of wide public interest. The alleged failure of the Department to comply with the consent decree was a frequent topic for comment by candidates in the March gubernatorial primary campaigns.)

In a letter to the court dated December 14, 1993, counsel for plaintiffs, after discussing a number of areas in which he believed DCFS was not in compliance with the decree, concluded by saying:

> It is difficult in a brief letter like this to describe all of the measures which are needed to deal with the broader issues causing the problems at [the Emergency Services Center]. It is even more difficult to discuss these kinds of complex issues in an open court status hearing every few months in which the parties and the Monitor speak briefly about one or two subjects in front of a room full of reporters. We therefore urge you to consider holding regular, in-chambers status hearings in addition to those in open court.

At a subsequent status hearing, the court indicated to counsel that it was sympathetic to this request and would hold some conferences in chambers. This prompted the present motion by the Cook County Public Guardian (who represents the abused and neglected children in the Juvenile Court of Cook County) and various other persons interested in child welfare to move to intervene in the action, pursuant to Rule 24(a) or (b) of the Federal Rules of Civil Procedure, for the purpose of seeking an order that all future proceedings be held in open court. The plaintiffs and DCFS have filed briefs in opposition to the motion to hold all proceedings in open court.

The persons who seek to intervene do not appear to meet the requirements for intervention, either as of right or in the court's discretion, as set out in Rule 24(a) and (b), Fed.R.Civ.P. Their motion to intervene is therefore denied. However, because the issue they raise is important for the public to understand, the court will address the merits of their motion to hold all proceedings in open court.

## DISCUSSION

■ The First Amendment provides a qualified right of public access to certain kinds of judicial proceedings. The case of *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), provides an illustration. Robert Diaz, a nurse, was charged by the State of California with the murders of twelve of his patients by means of drug injections. Under the law of California at the time, a defendant was entitled to a preliminary hearing before a magistrate. Diaz' hearing took 41 days, and was closed to the public pursuant to a California statute which allowed closure " 'in order to protect the defendant's right to a fair and impartial trial.' " *Id.* at 4, 106 S.Ct. at 2378 (citation omitted). The magistrate found that "closure was necessary because the case had attracted national publicity and 'only one side may get reported in the media.' " *Id.* (citation omitted). At the conclusion of the hearing, Diaz was held to answer on all charges. *Id.* A newspaper publisher, Press–Enterprise Company, asked that the transcript of the hearing be released. The request was denied and the magistrate sealed the record. *Id.* at 4–5, 106 S.Ct. at 2738–39. Appeals were then taken through the California courts, with the California Supreme Court ultimately holding that the transcripts could be kept under seal upon a finding by the magistrate that there was " 'a reasonable likelihood of substantial prejudice' " to the criminal defendant. *Id.* at 14 106 S.Ct. at 2743 (citation omitted).

The United States Supreme Court reversed, holding that the public had a qualified right of access to the transcripts and that the California courts had not taken suffi-

cient steps to protect that right. *Id.* at 14–15, 106 S.Ct. at 2743–44. The Court's discussion frames the questions raised by the pending motion in this case. The Court explained that there are "two complimentary considerations" in determining whether there is a right of public access to particular judicial proceedings:

First, because a "tradition of accessibility implies the favorable judgment of experience," [citations omitted] we have considered whether the place and process have historically been open to the press and general public.

&ast; &ast; &ast; &ast; &ast; &ast;

Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question.

*Id.* at 8, 106 S.Ct. at 2740. Applying these tests to the transcripts of the Diaz preliminary hearing, the Court held that a qualified right of public access existed. (The right is always "qualified" in the sense that there could be more important values that overcome it. *Id.* at 9, 106 S.Ct. at 2740–41.) "First," the Court noted, "there has been a tradition of accessibility to preliminary hearings of the type conducted in California." *Id.* at 10, 106 S.Ct. at 2741. Indeed, "the near uniform practice of state and federal courts has been to conduct preliminary hearings in open court." *Id.* The Court concluded that "[o]pen preliminary hearings, therefore, have been accorded ' "the favorable judgment of experience." ' " *Id.* at 11, 106 S.Ct. at 2742 (quoting *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 605, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982)).

Turning to the second of the "complimentary considerations," the Court phrased the question as follows:

The second question is whether public access to preliminary hearings as they are conducted in California plays a particularly significant positive role in the actual functioning of the process.

*Id.* at 11, 106 S.Ct. at 2742. The Court discussed the importance of the preliminary hearing under California law: "Because of its extensive scope, the preliminary hearing is often the final and most important step in the criminal proceeding." *Id.* at 12, 106 S.Ct. at 2742. The Court quoted the California Supreme Court in an earlier case to the effect that "the preliminary hearing in many cases provides 'the sole occasion for public observation of the criminal justice system.' " *Id.* (citation omitted). Concluding that "[d]enying the transcript of a 41–day preliminary hearing would frustrate what we have characterized as the 'community therapeutic value' of openness [citation omitted]," the Court held that the second test for a right of public access had been satisfied and "that the qualified First Amendment right of access to criminal proceedings applies to preliminary hearings as they are conducted in California." *Id.* at 13, 106 S.Ct. at 2743. In the final step of its analysis, the Court concluded that since there had been no finding by the California court "demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest,' [citations omitted]," the qualified right prevailed and the transcripts had to be released. *Id.* at 13–15, 106 S.Ct. at 2742–44.

The analysis of the Supreme Court in *Press–Enterprise* was applied in a civil context by the Sixth Circuit in *Cincinnati Gas and Elec. Co. v. General Elec. Co.,* 854 F.2d 900, 903 (6th Cir.1988), *cert. denied,* 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989), a suit by certain public utility companies alleging breach of contract and fraud in connection with the construction of a nuclear power plant. The trial court conducted a "summary jury trial" with a mock jury pursuant to an order which closed the proceeding to the press and public. The newspapers moved for access, which the trial court denied on the basis that the First Amendment right of access did not apply to a summary jury trial. The Sixth Circuit affirmed. Applying the first *Press–Enterprise* consideration, the court found that the summary jury trial is a settlement technique and that "[s]ettlement techniques have historically been closed to the press and public." *Cincinnati Gas,* 854 F.2d at 903.

Applying the second criterion of the Supreme Court's analysis, the Sixth Circuit held that

public access to summary jury trials over the parties' objections would have significant adverse effects on the utility of the procedure as a settlement device. Therefore, allowing access would undermine the substantial governmental interest in promoting settlements, and would not play a 'significant positive role in the functioning of the particular process in question'

*Id.* at 904–05 (citing *Press–Enterprise*, 478 U.S. at 8, 106 S.Ct. at 2739–40).

The court also rejected a general "right to know" argument by the newspapers:

Appellants' claim of a public "right to know" has no validity with regard to summary jury trials. As the lower court correctly noted, the public would have no entitlement to observe any negotiations leading to a traditional settlement of the case, ... and the parties would be under no constitutional obligation to reveal the content of the negotiations. Thus, the public has no first amendment right to access to the summary jury trial.

*Id.* at 905. The movants in this case emphasize the great public interest in the serious problems addressed by the consent decree and its implementation. They appear to believe that this public interest dictates a greater right of public access than might obtain in a case of lesser interest. But they cite no authority for that proposition, and *Cincinnati Gas* clearly rejects it. The effort of the newspapers to gain access to the summary jury trial in that case was a reflection of a legitimate public concern over the possibility of fraud and incompetence in the construction of a nuclear power plant. *See id.* at 904. Yet, there was no "right to know" that entitled the press to attend the summary jury trial or to have a transcript of it when completed.

A rule that would make public access depend upon the importance of the issues in the case, the number of people who might be affected by the ultimate decision in the case, or the intensity of public curiosity about the case would be unworkable. Many cases, especially in federal court, involve constitutional issues of great significance. Many, like the present case, are class actions challenging the administration of prisons, schools, welfare agencies and other governmental units. These suits usually seek fundamental reforms in tax-supported institutions, with sometimes enormous financial implications should the plaintiffs prevail. The public interest in cases of this kind is obvious. Even the more "routine" civil rights actions brought by individuals claiming police brutality, unlawful arrest, and unreasonable searches and seizures, not to mention the wide array of other individual civil rights actions alleging various kinds of due process and equal protection violations, are matters about which the public and the press are often curious and have good reason to be. It is difficult to think of a type of civil case that is outside the legitimate range of public interest. Employment discrimination cases, which comprise a substantial percentage of the civil litigation in federal courts, are clearly of public concern, whether they involve classes of plaintiffs or just individual plaintiffs. Cases involving claims of negligence on the part of railroads, airlines and other transportation industries are frequent subjects of newspaper comment and of legitimate concern to all persons who rely upon the safety of these services. Products liability cases are another obvious example.

Aside from the fact that the distinction between "routine" and "important" cases is impossible to make, even in theory, there are practical problems as well. If the rule were that no judge could confer with the parties in chambers in any case in which there is wide public interest, the judge would have to make a "public interest" determination before scheduling any meeting with the parties other than in open court. How would that determination be made? Various scenarios can be imagined, such as asking the opinions of the parties, checking with the media (How would this be done? Which media?), or perhaps relying on the judge's past experience as to which kinds of cases have generated the most publicity. The last suggestion might be the least helpful, since it is the experience of every judge that the subjects of media attention are often surprising. (The focus may be on the past history or personality of one of the litigants, something the judge knows nothing about; or it may be some other kind

of human interest aspect of the case unknown to the judge and perhaps even to the parties, that makes an interesting story.) The first practical difficulty, then, is that in many if not most instances it would impose an impossible task upon the judge to require an advance judicial determination that the case is "routine" rather than "newsworthy" before holding any in-chambers conference with the parties. It is no answer to say that in cases like this one the public interest is obvious. There will be other cases in which there is public curiosity that is unknown to the judge and many others where public access would itself create the public interest. Only 2.5 percent of the civil cases filed in this court are actually tried. *The Judicial Business of the United States Courts of the Seventh Circuit,* 1992, p. 26 (Report prepared by the Clerk of the United States Court of Appeals for the Seventh Circuit). Most cases are resolved by settlement, and many of these settlements are facilitated by conferences with the court in chambers. The discussions at these conferences are often far more lively and interesting than the routine trials that are open to the public. (Drug trials, which occupy such a large part of a federal judge's time, are rarely attended by anyone but a few veteran court watchers, and even they will usually leave after a short time.) If interesting subject matter were to be the test, then, it would make sense to require all conferences of any kind to be held in open court so that members of the public would have an opportunity to determine for themselves whether they are interested in the case, the legal arguments made, the lawyers, the parties, or perhaps even the comments of the judge.

This brings us to the second practical problem with the "public interest" approach, and that is the fact that some of the most essential purposes of private conferences with the court could not be accomplished in an open session with the public and the press in attendance. The greater the public interest in the case, the more likely this is true. A major purpose of private meetings with the court is to attempt to resolve differences between the parties. The privacy of the judge's chambers historically has provided an atmosphere conducive to candor and concilia-

tion. No one who knows anything about litigation is unfamiliar with this phenomenon. There is a strong public policy in favor of settlements, and the efforts of judges to promote settlement are among the most important functions they perform. This very case is an illustration of what can be accomplished by discussions in chambers as opposed to written briefs or proceedings in open court. There is no doubt that, had the court not held private sessions with the parties, no settlement would have occurred and no consent decree would have been entered. The case would have been tried to judgment and might now be wending its way through the appellate process.

To say, then, that the public and the press have a right to be present at all conferences in cases involving issues of great public interest is simply to say that traditional settlement conferences could not occur in those cases. The indispensable attitude for settlement—the willingness to concede that the other side has a point—would be absent, and the conference would more closely resemble the contentious status calls that have occurred in this case since entry of the consent decree.

For these reasons, it is not surprising that the courts have held there is no right of public access to settlement conferences. Neither of the requirements for public access is met: there is no historical tradition of public access, and public access, rather than promoting the purpose of the proceeding, is likely to frustrate it. *Cincinnati Gas,* 854 F.2d at 904.

■ Plaintiffs and DCFS argue in their briefs that the in-chambers conferences they wish to hold concerning implementation of the decree will be in the nature of settlement conferences, so that the rule of privacy applies. Movants term this argument "ludicrous" because the case was settled when the consent decree was entered. Movants' Reply Memorandum in Support of Motion for Leave to Intervene, at 2. In the court's view, both sides are right in part, but this results in movants ultimately being wrong. The case was indeed settled in the sense that the parties agreed upon entry of a very

complicated decree that would govern their rights. But the settlement expressed in the decree is not like the typical settlement, an agreement to pay and to accept a specific amount of money in return for mutual releases. The decree is a wide-ranging series of provisions which call for systemic reforms in the Department of Children and Family Services. Many of the reforms are stated in terms that are necessarily general, since both sides recognized that experience would have to inform some of the implementation measures. Some of the relief will be guided by the recommendations of expert Reform Panels that are provided for in the decree. There are numerous deadlines for various improvements to be accomplished—case workers to be hired and trained, caseloads to be reduced, improvements in housing and medical attention for the children, accelerated determinations as to whether children will be restored to their natural parents or placed for foster care or adoption, improvements in the recruitment and training of foster and adoptive parents, and a host of other innovations in areas vital to child welfare. Many of the deadlines are not being met, which raises questions of why not and what to do about it. The Monitor is meeting with the parties on a regular basis, sometimes together and sometimes separately, as provided for in the decree. The Monitor confers with the court from time to time, both by telephone and in person, and this, too, is provided for in the decree.

In short, much remains to be done, and, in fact, much remains to be decided. In many instances, there is a threshold question of whether DCFS is in fact out of compliance. And, if it is, there are certainly issues as to the appropriate remedy. The deadlines in the decree are very short, unlike anything attempted anywhere before. In retrospect, some of these deadlines may have been unrealistic even at the time they were incorporated in the decree. Subsequent events have raised additional problems. The number of children in DCFS custody as of March 31, 1994, was 39,154, an 86 percent increase over the 20,965 at the time the decree was entered just 2½ years ago. Challenges associated with the overlapping problems of poverty, growing unemployment, homelessness, crises of various kinds in the public school system, teenage pregnancy, violence and drug abuse infiltrate almost every aspect of the task assigned to DCFS. This is not to say that DCFS is excused from exerting its best efforts to comply with the decree, but it is background necessary to an understanding of the compliance questions.

These problems of compliance, and disputes about compliance, are appropriate subjects for settlement conferences. The idea that the entry of a judgment rings down the curtain on settlement possibilities is contrary to experience. Many judgments give rise to disputes concerning their implementation, and those disputes are often resolved by the same techniques used in pretrial settlements. For example, patent and trademark infringement cases often result in decrees, either after trial or by consent. The alleged infringer is enjoined from further acts of infringement, and the court reserves jurisdiction to enforce the decree. Occasionally, questions will arise as to whether the defendant's post-decree conduct violates the injunction. Disputes over that question can often be resolved by conferences with the court. Similarly, in almost any case involving institutional reform, post-decree disputes are likely and settlement conferences with the court are useful in working out the inevitable problems. Well-known examples in this court are cases involving conditions at the Cook County Jail and the placement of public housing sites.

■ The right of public access to a conference between the parties and the court depends not upon when the conference is held but upon its purpose. If the purpose is one that will not be aided by the presence of members of the public, and if the conference is of a kind that has not traditionally been open to the public, then, regardless of whether the conference is before or after judgment, there is no right of public access. That is the rule to be derived from the cases, and it is the only one that makes sense.

■ Just as timing is not a controlling factor, neither is nomenclature. "[T]he First Amendment question cannot be resolved solely on the label we give the event, *i.e.,*

'trial' or otherwise,...." *Press–Enterprise*, 478 U.S. at 7, 106 S.Ct. at 2740. While there is generally a right of public access to a trial, the public can properly be excluded from conferences between the court and counsel even during a trial. *United States v. Gurney*, 558 F.2d 1202, 1210 (5th Cir.1977), *cert. denied, Miami Herald Pub. Co. v. Krentzman*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). The "summary jury trial" in *Cincinnati Gas* was a settlement technique, with no right of public access. And simply because a judge might call a proceeding a "conference" does not determine the question of public access; the proceeding, by whatever name, could be one at which the activity has traditionally been open to the public and whose purpose would be served by public access. If those conditions are met, there is a right of public access.

The hallmark of a proceeding traditionally open to the public is that the proceeding is one in which the court will adjudicate a party's substantive rights. In *Press–Enterprise*, the preliminary hearing in the criminal case determined whether the defendant would be bound over for prosecution. "If the magistrate determines that probable cause exists, the accused is bound over for trial...." 478 U.S. at 12, 106 S.Ct. at 2742. Distinguishing the preliminary hearing in *Press–Enterprise* from the summary jury trial in *Cincinnati Gas*, the Sixth Circuit made the following observations:

> Appellants also argue that the summary jury trial should be open to the public because the facilitation of a settlement between the parties has a final and decisive effect on the outcome of the litigation. To support their argument, appellants rely on the Court's language in *Press–Enterprise II*, [478 U.S. at 11–15], 106 S.Ct. at 2742–43, that preliminary criminal hearings must be open to the public because of their decisive effect on criminal cases. We disagree.
>
> In contrast to the summary proceedings in this case, the proceeding at issue in *Press–Enterprise II* resulted in a binding judicial determination which directly affected the rights of the parties. Summary jury trials do not present any matters for adjudication by the court. *Thus, it is the presence of the exercise of a court's coercive powers that is the touchstone of the recognized right to access, not the presence of a procedure that might lead the parties to voluntarily terminate the litigation.* Therefore, we find appellant's argument to be meritless.

*Cincinnati Gas*, 854 F.2d at 905 (footnote omitted) (emphasis added).

In this case, the press and public have had access to all proceedings in which the rights of the parties have been adjudicated. Public hearings were held before the decree was approved by the court. The decree itself is a public record, and the various reports filed by the parties and the Monitor concerning implementation of the decree are available to the public. *See* discussion *supra* 478 U.S. at 2–3, 106 S.Ct. at 2736–38.

Scores of in-chambers conferences are held every week by the judges of this court, with no objection by anyone. Some of the conferences take place in cases involving important public issues widely covered in the press. Apparently the Cook County Public Guardian is no stranger to this procedure. In its brief in opposition to the pending motion, DCFS points out that in the case of *Aristole P. v. Ryder*, No. 88 C 7919, in which the Public Guardian is counsel for a class of plaintiff children in DCFS custody, "the parties and the Court there have had a total of sixteen pretrial settlement conferences in chambers over a two-year period (during which time *no* open court hearings at all were held in the case)." Defendant's Response to Proposed Intervenors' Motion, p. 4 n. 1 (emphasis in original). In his reply brief, the Public Guardian did not respond to this statement.

### CONCLUSION

The motion of the Cook County Public Guardian and other movants for entry of an order that all future proceedings in this case be held in open court is denied. Conferences concerning implementation of the consent decree may, in the discretion of the court, be held in chambers. In deciding whether to hold a particular proceeding in chambers, the court will be guided by the principles ex-

plained in *Press–Enterprise* and *Cincinnati Gas,* and discussed in this opinion.