Filed 2/4/15  P. v. Rhodes CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B254682 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA383914) |
| v. | |
| RAY ANTHONY RHODES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Henry J. Hall, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Ray Anthony Rhodes of two counts of a lewd act upon a child (Pen. Code, § 288, subd. (a))[1] (counts 1, 3), procuring a child to engage in a lewd act (§ 266j) (count 5), pandering by procuring a minor under age 16 (§ 266i, subd. (b)(2)) (count 6), and pimping a minor under age 16 (§ 266h, subd. (b)(2)) (count 7). The trial court found true the allegations that defendant had suffered 10 prior prison terms within the meaning of section 667.5, subdivision (b); two prior serious felony convictions within the meaning of section 667, subdivision (a); and one prior serious or violent felony conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

The trial court sentenced defendant to prison for 45 years. The sentence consisted of 16 years (the high term of eight years doubled) in count 1 and consecutive four-year terms (one-third the midterm of six years doubled) in counts 3, 5, and 7. The sentence in count 6 was stayed pursuant to section 654. The court added five years for each of defendant's two prior convictions under section 667, subdivision (a) and seven years for seven of defendant's prior prison terms under section 667.5, subdivision (b).

Defendant appeals on the ground that his convictions must be reversed for the improper closure of the preliminary hearing in violation of his Sixth Amendment right to a public trial.

**FACTS**

**Prosecution Evidence**

After running away from her placement, 13-year-old Princess G. met defendant at the corner of Florence and Vermont Avenues as he sat in a car with another man. Defendant gave Princess his telephone number, and she called him that same day. A few days later, Princess saw defendant in his car, and she got in and drove around with him as they talked. She did not tell defendant her age or that she was a runaway.

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

Princess called defendant after a few days, and he picked her up and took her to his mother's house and the home of a woman defendant called Kiki. The three of them ate, watched television, and talked. Princess told Kiki her name but lied about her age, saying she was 19. The next time defendant picked up Princess, he again took her to Kiki's house.

Kiki's name was Bianca Blanton, and she had an undefined relationship with defendant. Defendant left Princess with Kiki, and Princess confessed to Kiki that she had been a prostitute. Kiki told her she knew how to make more money, and they discussed how much to charge for various sexual acts, such as $100 for intercourse and $50 for oral sex. Kiki took Princess to meet a customer of Kiki's with whom she regularly had sex. Princess performed oral sex on the customer and was paid. When they returned to Kiki's home, defendant was there. Princess gave the money she had just been paid to defendant. She did this because she and Kiki had discussed how Princess could make more money by letting defendant keep her money, although Princess had not agreed to allow defendant to be her pimp. Princess went to Kiki's house two or three times. Defendant did not say anything about the money Princess gave him.

When they left Kiki's house, defendant drove Princess to Pacific Coast Highway at Daisy Road. He took her phone and gave her a different one, telling her to call him when she was done. Princess understood that he meant prostituting. Princess met with a man who was an undercover police officer and was arrested. She was allowed to go home, and she called defendant the next day. Defendant met with her, and they talked about how she got arrested. Princess told defendant she had to go and left. She then went to jail in Inglewood and never saw defendant again.

Princess had no feelings for defendant at the time of trial. When she testified against him at the preliminary hearing in August 2012, she believed it was not fair because defendant had not done anything to hurt her. Princess had experience with a prior pimp who had treated her badly. His name was "Black," and she had met him while walking in the neighborhood after having run away from another placement. Black told her he would kill her if she did not prostitute for him, and he beat her.

3

Princess thought she and defendant were in a dating relationship at first. They talked a lot and got to know each other. They went to a hotel and engaged in vaginal and oral sex a few days after they met. Defendant brought her breakfast and then took her home. She prostituted for defendant because she cared about him and thought it would make him happy.

Princess also testified that when defendant took her to Kiki's house, they had already discussed prostitution, and Kiki gave her a little black dress to wear. Defendant took Princess to Figueroa Street, which was an area known for prostitution, and she had two to three "dates" there. She estimated that she was paid $150. She gave it to defendant because the money "belonged" to him. When she gave him the money, defendant said, "Good," and her took her home. At the preliminary hearing, Princess testified she had asked defendant what he liked to do, and he responded, "get money." When she asked "such as?" he said, "pimping."

Princess acknowledged telling police during her first interview in January 2011 that she had been prostituting for five months and met her pimp, defendant, at a party. She called him "Black, Bone, or Ray." She said he threatened her with a gun and demanded she work for him. She agreed because she was afraid. Princess said that defendant took her to a house in Compton where he was staying with a woman named Lucky. She said defendant gave her marijuana and she passed out. She believed he put a sleeping pill in her drink. When she woke up, defendant was lying next to her in bed. She did not consent to having sex with defendant and was passed out when he had sex with her. Princess also said Lucky was defendant's "main girl," and she showed Princess how to be a prostitute.

Princess also told police her first "date" was in a hotel room with a white male who paid her $100, and she was instructed to give the money to defendant. She said she was told to call defendant "Daddy." She did not call him "Black" after that because she was scared he would beat her. Princess said her second "date" was with a Hispanic male. She gave the money to defendant. Lucky took Princess on a couple of her dates and made Princess watch. Princess said defendant then took her to a motel room and tried to

4

force her to French kiss Lucky. When Princess refused, defendant became enraged and kicked her in the back while she was lying on the bed, leaving a footprint on her back. When defendant and Lucky left to go to the store, Princess escaped and went home. Princess told her parents what happened but told them not to call the police because she was afraid defendant was going to shoot her. Princess was arrested later that night for fighting with her mother. When she was released from juvenile hall, she went home and her life returned to normal until January 14, 2011. She then called defendant because she was afraid he would hurt her if he saw her in the streets.

Princess said on another occasion that defendant had told her to "give him head" and she refused. Defendant punched and slapped her. She told the police she did not want to prostitute but she cared about Black and thought he cared about her because he said he loved her. After the interview, Princess showed the police where this person she had described lived, and it was defendant's home. Princess also identified a picture of him. Princess was interviewed in February and April as well, and she made different statements during those interviews.

Detective Satwan Johnson of the Long Beach Police Department is a member of the Los Angeles Metro Human Trafficking Task Force. In January 2011, he received a call to meet with Princess, who was afraid and timid. Detective Johnson interviewed and photographed her. He asked her what had happened, whom she worked for, whether she had a pimp, how long she had been prostituting, and which track she had worked. The detective explained that a "track" is a street or area that has a large number of motels.

Detective Johnson took a phone Princess had in her possession. Princess thought it belonged to defendant's brother. She identified photos of defendant's brother that were on the phone. Princess directed Detective Johnson to defendant's house.

Detective Johnson interviewed Princess again after her arrest on February 8, 2011. He wished to clarify some inconsistencies in her statements. Inconsistencies were common with minors who were "the pimp's property." They are indoctrinated and told not to talk to or trust the police. Until they trust an officer, they will lie. Detective Johnson observed that Princess became more comfortable with him and was happy to see

5

him.  She became more forthcoming.  She revealed that she had initially been talking about her first pimp who went by the moniker "Black."  She revealed her other pimp was defendant.  Princess gave the name "Black" because she cared about defendant and wanted to protect him.

Detective Johnson went with Princess to locate the woman Princess had described. They found the location, and Detective Johnson set up surveillance.  They saw Bianca Blanton leave the home.  She was stopped and subsequently interviewed.

Bianca Blanton testified that she dated defendant for eight or nine months in 2011. She met Princess four times, but only once at her home.  Blanton said she was not Kiki or Lucky, and she did not help Princess be a prostitute.  Defendant told Blanton that Princess was his cousin.  Blanton believed Princess was 18 years old.  Defendant was approximately 30 years old.  Defendant left Princess at Blanton's home while he went to run errands.  Princess told Blanton she was a prostitute for defendant and had been a prostitute for "some time."  She said she had met defendant at a party.  Blanton was not concerned if Princess was prostituting because she believed Princess was "grown." Defendant called Blanton when the case against him first began—over a year before trial. Blanton did not recall the conversation, but the police took it as a threat.

**Defense Evidence**

Defendant testified in his own behalf.  He was 35 years old at the time of trial and had suffered several prior convictions.  In 2011, he lived with his mother and was in a relationship with Dawn Smith, whom he had known for over four years.  She was still his girlfriend.  He had a six-year-old son and an eight-year-old daughter who was in his custody and lived with defendant and his mother.  Defendant met Bianca Blanton at a club, and they exchanged telephone numbers.  He had a fling with her for five to six months, which ended in April or May 2011.

Defendant met Princess at a smoke shop near his house.  She was buying some blunt for smoking marijuana, and defendant told her he sold "weed."  They exchanged numbers so that Princess could call him when she wanted marijuana.  Princess called him about a week later and asked what he was doing.  When defendant told her he was

6

smoking marijuana in the garage with his brother and friends, she asked if she could come over to smoke. Defendant went to pick her up, and they came back and smoked for about an hour. Defendant then took Princess with him to pick up his daughter and returned to his home. He then received a call from Blanton, who wanted marijuana. Defendant took Princess with him to Blanton's home. They went inside and smoked marijuana. Defendant got a call and needed to leave. He asked Blanton if she could watch Princess while he ran an errand. Defendant was gone for an hour. When he returned, he stayed for another 30 minutes, then took Princess home.

Princess called defendant a few days later, asking for marijuana. Defendant went to her mother's home, sold her the marijuana, and left. He may have had contact with her one more time. The subject of Princess's becoming a prostitute never came up. He and Princess had a platonic business relationship for the purchase of marijuana. They never discussed anyone named "Black." Defendant never took her to places to prostitute and never took money from Princess except in exchange for marijuana. They never had any physical contact.

Dawn Smith testified that defendant was her boyfriend, and she had known him for four years. She saw him almost every day and was aware he had two children. Smith did not know Bianca Blanton or Princess. She knew defendant sold marijuana to make money.

## DISCUSSION

### I. Defendant's Argument

Defendant contends his convictions must be reversed because the trial court did not conduct a sufficiently thorough on-record analysis of the factors justifying closure of the preliminary hearing as required by section 859.1 The court did not demonstrate that defendant's constitutional right to a public trial was overridden by higher values, as required by the Sixth and First Amendments.

### II. Relevant Authority

Section 859.1 provides in pertinent part: " (a) In any criminal proceeding in which the defendant is charged with any offense specified in Section 868.8 on a minor

7

under the age of 16 years, . . . the court shall, upon motion of the prosecuting attorney, conduct a hearing to determine whether the testimony of, and testimony relating to, a minor . . . shall be closed to the public in order to protect the minor's . . . reputation. [¶] (b) In making this determination, the court shall consider all of the following: [¶] (1) The nature and seriousness of the offense. [¶] (2) The age of the minor, . . . [¶] (3) The extent to which the size of the community would preclude the anonymity of the victim. [¶] (4) The likelihood of public opprobrium due to the status of the victim. [¶] (5) Whether there is an overriding public interest in having an open hearing. [¶] (6) Whether the prosecution has demonstrated a substantial probability that the identity of the witness would otherwise be disclosed to the public during that proceeding, and demonstrated a substantial probability that the disclosure of his or her identity would cause serious harm to the witness. [¶] (7) Whether the witness has disclosed information concerning the case to the public through press conferences, public meetings, or other means. [¶] (8) Other factors the court may deem necessary to protect the interests of justice."

## III. Proceedings Below

At the start of the preliminary hearing, the prosecutor moved under section 859.1 to have the courtroom closed during the minor's testimony, and defense counsel objected. The prosecutor subsequently argued that the minor was 14 years old and during the time period at issue, she was 12 and 13. The prosecutor stated the victim had "come a long way since she was arrested when she was 13 years old, and she had a great deal of concern about people hearing about what she did, how she did it, and what went on during that period of time." She preferred to have the courtroom closed because she did not want "her business being out there." She wanted to improve her reputation and "something like that in open court, when she was working it was different parts of the Los Angeles and I believe the Long Beach area and it could be quite problematic as she tries to move past this."

Defense counsel argued that defendant had a right to a public hearing. Since section 859.1 was designed to protect a person's reputation, the defense requested the

8

People to bring forth evidence that the witness's reputation was at risk beyond the fact that she was not comfortable testifying in a courtroom.

The court took the matter under submission, and later asked the prosecutor to reiterate the reasons for closing the hearing. The prosecutor stated, "Given Princess G.'s age, which is currently 14—these incidents occurred right between the ages of 12 and 13—given the fact that she's currently trying to move forward in her life and she's in a place where they're helping her get that, there's concern with respect to having her testify to the graphic nature of some of the things that she did when she was younger and especially since some of the things that she did when she was younger were in different parts of Los Angeles. So there's always the chance—and it doesn't say it has to be concrete. It's not speculative. It's dealing with the harm to one's reputation. She's trying to move forward from the whole pimping and pandering aspect. She's trying to move forward. That fact that engaging in, at 12 and 13, in sexual conduct with an adult male who's 33 years old and given those facts, it's a real possibility that issues regarding her reputation which she's trying to fix could be disseminated in the community."

Defense counsel again objected and pointed out that the public had a right to a transcript of the hearing in any event. Moreover, the only people present were either close friends or family members of defendant's who were well aware of the charges and who had a right to be there. The victim had allegedly been prostituting herself for two years and was a mature 14-year-old. The prosecutor argued that the majority of the public would not attempt to obtain the transcripts. She accused defense counsel of arguing that the victim did not have a reputation worth saving. Defense counsel refuted this accusation and asserted that the prosecutor needed to put forth some evidence that someone in the courtroom might do something to disseminate the information.

The court found that sufficient factors in section 859.1 supported the prosecutor's motion, and it closed the preliminary hearing during Princess's testimony. The trial court subsequently denied defendant's pretrial motion under section 995, which was based on the alleged improper closing of the preliminary hearing.

9

## IV. Any Error Harmless

A defendant has a statutory right to a public preliminary hearing. (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 522 (*Pompa-Ortiz*).) The California Supreme Court found no authority to support the defendant's argument that an open preliminary hearing is compelled by the "'public trial' language of the Sixth Amendment." (*Id.* at p. 523.) Nevertheless, "it is clear that the defendant's statutory right to an open preliminary hearing is closely aligned with certain values protected under the Fifth, Sixth, and Fourteenth Amendments, which together provide a criminally accused person with a right to a fair trial before an unbiased jury. [Citation.]" (*Eversole v. Superior Court* (1983) 148 Cal.App.3d 188, 198, fn. 5.)

Addressing these values, the court in *People v. Woodward* (1992) 4 Cal.4th 376 (*Woodward*) stated, "'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. . . . [Citations.] [Fn.] [¶] In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury.'" (*Id.* at p. 385, quoting *Waller v. Georgia* (1984) 467 U.S. 39, 46 (*Waller*).) The right to an open trial may give way to other interests, but "the balance of the [competing] interests must be struck with special care." (*Waller*, at p. 45.) A defendant's qualified First Amendment right to a public preliminary hearing is well established. (*Press-Enterprise Co. v. Superior Court* (1986) 478 U.S. 1, 13.)

With respect to trials, a defendant's right to a public proceeding under the First, Sixth, and Fourteenth Amendments to the federal Constitution and article I, section 15 of the California Constitution is not absolute, and the proceedings may be closed under certain circumstances. (See *Waller*, *supra*, 467 U.S. at p. 45.) *Waller* held that four requirements must be met before the public's access to a criminal proceeding may be denied: (1) there must be an overriding interest that is likely to be prejudiced if the proceeding is not closed, (2) the closure must be narrowly tailored to protect that interest,

(3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) the trial court must articulate the interest being protected and make specific findings sufficient for a reviewing court to determine whether closure was proper. (*Waller*, at p. 48, citing *Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501; see also *Woodward*, *supra*, 4 Cal.4th at p. 383.)

As noted, under section 859.1, the trial court may close the courtroom after holding a hearing in which the court considers seven named factors and any other factors the court deems necessary to protect the interests of justice. In ruling on the prosecutor's motion on July 25, 2012, the court noted defense counsel's argument against closure but "believe[d] that after reviewing [section 859.1], there are sufficient factors in here that fall within the purview of closing. So I would grant it in respect to that one witness."

Recognizing that the interest expressed by the prosecutor on behalf of Princess was an important one, we nevertheless believe the trial court's findings were cursory and failed to demonstrate that it properly considered the factors set out in section 859.1. The court did not articulate any concern over whether there was an overriding public interest in having an open hearing in this case. (§ 859.1, subd. (a)(5).) Also, the prosecutor's presentation was devoid of specific facts regarding Princess's current situation, and the court made no inquiry regarding the alluded-to efforts she was making to repair her reputation. The prosecutor's argument did not rise to the level of showing a substantial probability that Princess would suffer harm by testifying in open court. Moreover, defendant had friends and family members in the audience at his preliminary hearing. With respect to trials, the United States Supreme Court has expressed particular concern for ensuring the attendance of a defendant's family members, stating that "the accused is at the very least entitled to have his friends, relatives and counsel present." (*In re Oliver* (1948) 333 U.S. 257, 271-272 & fn. 29; *Guzman v. Scully* (2d Cir. 1996) 80 F.3d 772, 775, 776 [when determining whether closure is warranted, trial court is obliged to give significant weight to the fact that persons excluded were defendant's family members].) *Guzman* also stated that a court may not simply "rel[y] on the unsubstantiated statements of the prosecutor, rather than conducting an inquiry of the prosecution witness on whose

11

behalf the closure request was made." (*Guzman*, *supra*, at p. 775; see also *Davis v. Reynolds* (1989) 890 F.2d 1105, 1110 [consideration of a victim's age and the type of offense support closure only when part of a careful case-by-case analysis of the individual situation].)

We conclude, however, that any error by the court was harmless beyond a reasonable doubt. Irregularities in preliminary examination procedures are to be reviewed under the appropriate standard of prejudicial error. Reversal is required only upon a showing that the defendant was deprived of a fair trial or otherwise suffered prejudice as a result of the denial of a substantial right at the preliminary hearing. (*Pompa-Ortiz*, *supra*, 27 Cal.3d at p. 529; see also *Coleman v. Alabama* (1970) 399 U.S. 1, 11 [no presumption of prejudice due to deprivation of counsel at preliminary hearing]; *People v. Tena* (2007) 156 Cal.App.4th 598, 615 [denial of right of self-representation at preliminary hearing subject to harmless error analysis].) Defendant underwent a public trial. Although there were differences between Princess's testimony at the preliminary hearing and at trial, these differences were not significant.

Defendant complains that Princess's preliminary hearing testimony contained lies that allowed the government to taint defendant with that prior testimony, which Princess was unwilling to repeat in open court. It is true that the prosecutor read certain portions of Princess's preliminary hearing testimony during her direct examination. At trial, Princess was asked where she got the dress she was wearing in a photograph of her taken when she was arrested, and she responded that she bought it with money her mother gave her. The prosecutor read a portion of the preliminary hearing transcript wherein Princess said defendant bought the dress for her with the money she got for him. When confronted with this former testimony, Princess explained she did not remember who gave her the dress because her mother had given her some money the same day that defendant took her shopping.

At trial, Princess did not remember having said that defendant liked to make money by pimping. The prosecutor read Princess's preliminary hearing testimony

12

wherein she stated that she had had that conversation with defendant. Princess once again stated she did not remember the exchange.

Princess also testified at trial that she did not remember saying she scored three dates and gave the money to defendant. She shortly thereafter stated she gave the money to defendant and acknowledged, without any testimony being read to her, that she had previously told the court that the money belonged to defendant.

These discrepancies were of no consequence when one considers Princess's trial testimony as a whole. There was other trial testimony in which Princess acknowledged that she gave her money earned from prostitution to defendant and that he had taken her to a certain location to work at prostitution. Princess described acts that clearly indicated defendant had acted as her pimp.

In addition, Princess said at trial that she had sex with defendant only one time. The prosecutor then read a portion of the preliminary hearing transcript where Princess stated she had engaged in sex with defendant twice at the Red Carpet motel. Princess continued to insist, however, that she had had sex with defendant only once at the motel, despite her former testimony. Here again, other portions of Princess's trial testimony indicated Princess had sexual relations with defendant. And, when confronted with her former testimony that she had engaged in sex with defendant twice, she stated it was "probably the same day after."

It was also clear from Princess's trial testimony that she had cared about defendant, had been in love with him, and sought to protect him, although she stated she was currently protecting only herself. The jury was clearly aware of her bias and that it affected her credibility at both proceedings. And although defendant points out that Princess substituted his name for the name of her first, more abusive, pimp when she made certain accusations, it was defense counsel who brought up Princess's statements to police about the abuse committed by the other pimp. It was defense counsel who elicited that her abusive pimp was called, "Black, Bone, or Ray." After an exhaustive exposure of Princess's account to police of her pimp's abuse, counsel himself made use of Princess's preliminary hearing testimony. He elicited from Princess that her testimony at

13

the preliminary hearing was 100 percent true, and that she testified at the hearing that every statement she had made about defendant to police had been a lie.

Given Princess's testimony at defendant's open trial, we believe that any error in closing the preliminary hearing was harmless beyond a reasonable doubt in that it did not affect the verdicts. (*Chapman v. California* (1967) 386 U.S. 18, 24.) As in *Pompa-Ortiz*, where the defendant's trial was open to the public, "there is no basis for assuming that the compromising of the values underlying open hearings in any way prejudiced defendant. Those are the avoidance of 'abuse or arbitrary use of judicial power'; the promotion of public confidence in the administration of justice; the deterrence of an open hearing to the commission of perjury; and the possibility that publicity attendant on an open hearing will lead to the discovery of important witnesses. [Citations]." (*Pompa-Ortiz*, *supra*, 27 Cal.3d at p. 530; see also *Woodward*, *supra*, 4 Cal.4th at p. 385 [reciting benefits of a public trial].) Defendant suffered no prejudice from any error in closing the preliminary hearing during the victim's testimony.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

14