# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re The Personal Restraint Petition of:<br><br>SERGEY V. GENSITSKIY,<br><br>Petitioner. | No. 49044-7-II<br><br><br>UNPUBLISHED OPINION |

SUTTON, J. — In this personal restraint petition (PRP), Sergey Gensitskiy challenges his convictions for four counts of child molestation. Gensitskiy claims that (1) the prosecutor engaged in improper ex parte communication by obtaining a pretrial order authorizing review of the jury book and jury list from a judge without providing notice or opportunity to respond, (2) the ex parte communication violated his right to a public trial, (3) the ex parte communication violated his right to be present at critical proceedings, and (4) he received ineffective assistance of trial and appellate counsel. We deny Gensitskiy's petition for relief.

## FACTS

In 2011, the State charged Gensitskiy with a total of twelve counts of sex offenses against five different victims, including CSG.[1]

---

[1] We use initials to protect the witness's identity. General Order 2011-1 of Division II, *In Re The Use Of Initials Or Pseudonyms For Child Witnesses In Sex Crime Cases*, available at: http://www.courts.wa.gov/appellate_trial_courts/.

1

I. PROPOSED ORDER AUTHORIZING REVIEW OF JURY BOOK AND JURY LIST (jury book order)

On July 25, 2012, an omnibus hearing was held to address discovery and pretrial issues in Gensitskiy's case. The case was considered ready for trial the following week. Sometime after the hearing, the deputy prosecuting attorney in Gensitskiy's case, Anna Klein, sent a proposed order authorizing review of the jury book and jury list to the court for signature. As was Klein's practice, the proposed order was sent from the prosecutor's office with a runner for signature by an available judge. The prosecutor did not meet with the judge in order to obtain a signature for the proposed order.

The proposed order allowed Klein to "remove the juror book and jury list from the [c]ourt for her personal review and immediate return to the [c]ourt." Declaration of Tom Maybrown, Appx. E (Order Authorizing Review of Jury Book (Including Jury List), filed Clark County Superior Ct., July 25, 2012 (jury book order). The jury book order also stated that "no copies will be made and no other person shall be allowed to review the material and the book shall be returned to the [c]ourt within twenty four hours[.]" Maybrown Decl., Appx. E. The jury book order was signed by Judge Stahnke. Judge Stahnke was not the assigned trial judge for Gensitskiy's trial.

II. TRIAL TESTIMONY

All the victims testified at trial. Because their testimony is not relevant to the issues Gensitskiy raises in his PRP, we do not recount the details here. One of the victims recanted his prior statements. Another victim testified that at one point she believed the allegations she had made but currently questioned whether they were true.

2

No. 49044-7-II

Erin Haley is a child and family therapist. At the time of trial, Haley was seeing CSG weekly or every other week. Haley testified that the "initial concerns [CSG] came in for were related to sexual abuse." CD Proceedings, Vol. 2 at 284 (VRP). Haley testified as follows:

[STATE]: Okay. So did you ever find out from [CSG] what exactly it was that had happened to her sexually?

[HALEY]: Yes.

2 VRP at 284. Gensitskiy's counsel objected to Haley testifying as to CSG's statements, but the trial court overruled the objection.

Haley also testified,

[HALEY]: Well, I've offered a few diagnoses. Originally when I first met with her on November 3rd, 2010, I offered a diagnosis of sexual abuse of a child, which indicates she was a victim of sexual abuse. And that is how we treat children who come in through our specific sexual abuse grant.

. . . .

[HALEY]: The diagnosis offered for [CSG] later in her treatment was posttraumatic stress disorder and also major depressive disorder.

[STATE]: And can you explain what those are, first of all?

[HALEY]: Sure. So posttraumatic stress disorder is a mental health condition that can come on after someone experiences a traumatic event. And it includes responses such as helplessness, extreme fear, anger, and those reactions are quite common to a traumatic event, though the symptoms in posttraumatic stress disorder last at least one month after the trauma and tend to either worsen or get to a level where they're interfering significantly in someone's life's functioning. So that's posttraumatic stress disorder.

2 VRP at 287-88. Gensitskiy did not object to any of the above testimony. On redirect, the following exchanges took place:

3

[STATE]: Okay. And what made you feel that her posttraumatic stress disorder is associated with a (sic) sexual abuse?

[HALEY]: Well, [CSG] had disclosed that she had experienced sexual abuse and that her flashbacks as part of her posttraumatic stress disorder were specific to the sexual abuse trauma.

[STATE]: And are her nightmares regarding any specific person or issue?

[HALEY]: Some of the nightmares [CSG] has endorsed are related to fearfulness about her father. They were more generalized, which is common, particularly for children. The nightmares were generally about her father hurting her, killing her, just fearful dreams about her father.

2 VRP at 308-09. Again, Gensitskiy did not object to Haley's testimony. Finally, on recross, Gensitskiy's counsel engaged in the following exchange with Haley:

[COUNSEL]: Is there any means as a counselor that you can ascertain as to whether or not the complaints of abuse are accurate?

[HALEY]: I would say that – I guess I'm having a hard time answering your question. The way I look at it is, it's not my job to investigate the allegations of the abuse. And so I take in the disclosures that individuals share with me along with some collaborative information to make my determination. But again, I'm not determining whether it's true or not. My job is to treat the individual with the symptoms that they come in for.

[COUNSEL]: So you're treating the sym – I don't want to put words in your mouth, but sounds like you're saying I'm treating the symptoms, not the allegations?

[HALEY]: I guess I'm not sure how I would treat allegations, so I think that's fair to say I'm treating the symptoms.

2 VRP at 314.

4

### III. VERDICT AND DIRECT APPEAL

The jury found Gensitskiy not guilty of two of the charged counts. The jury found Gensitskiy guilty of the remaining ten counts. Gensitskiy appealed.

On direct appeal, Division One of this court reversed six of Gensitskiy's convictions based on defects in the charging documents. *State v. Gensitskiy*, noted at 182 Wn. App. 1016 (2014). Our Supreme Court denied review. *State v. Gensitskiy*, 182 Wn.2d 1013 (Mar. 4, 2015) (ruling denying review). Therefore, Gensitskiy's only remaining convictions at issue in this PRP are four counts of child molestation concerning CSG.

### IV. PERSONAL RESTRAINT PETITION

Gensitskiy filed a timely PRP challenging his remaining convictions. Gensitskiy's trial counsel, Charles Buckley, filed a declaration in support of Gensitskiy's PRP, in which he states that he was never given any notice that Klein intended to obtain the jury book order. Buckley also stated, "If I had known that the prosecutor intended to obtain the juror list and jury book on July 25, 2012, I would have insisted that these same benefits be given to the defense." Decl. of Charles Buckley Jr. at 3. In his own declaration, Gensitskiy states that he had no knowledge of the jury book order and only found out about it when his current attorney showed it to him. He also claims that, if he had notice that Klein had intended to obtain the jury book order, he would have insisted that his attorney do the same.

### ANALYSIS

### I. LEGAL PRINCIPLES

To be entitled to relief in a PRP, the petitioner must establish either a constitutional error that caused actual and substantial prejudice or a nonconstitutional error that is "a fundamental

defect resulting in a complete miscarriage of justice." *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013).

A PRP must state with particularity the factual allegations underlying the petitioner's claims. *In re Pers. Restraint of Schreiber*, 189 Wn. App. 110, 113, 357 P.3d 668 (2015). And the petitioner's factual allegations must have evidentiary support. *Schreiber*, 189 Wn. App. at 113. "The petitioner may not rely on mere speculation, conjecture, or inadmissible hearsay." *Schreiber*, 189 Wn. App. at 113. Bald assertions and conclusory allegations are insufficient to support the petitioner's claims. *Schreiber*, 189 Wn. App. at 113.

If the petitioner fails to show either actual and substantial prejudice or a fundamental defect, we deny the personal restraint petition. *Schreiber*, 189 Wn. App. at 113. If we are convinced the petitioner has met his or her burden to prove actual and substantial prejudice or a fundamental defect, we grant the petition. *Schreiber*, 189 Wn. App. at 113.

## II. EX PARTE COMMUNICATION

Gensitskiy claims that the jury book order was an improper ex parte communication between Klein and the trial court. Because Gensitskiy cannot show actual and substantial prejudice resulting from the jury book order, we deny his petition on this ground.[2]

---

[2] Gensitskiy also alleges that Judge Stanhke violated the appearance of fairness doctrine by granting the prosecutor's motion. Under the appearance of fairness doctrine, a presiding judge must actually be impartial and also appear to be impartial. *State v. Gamble*, 168 Wn.2d 161, 187, 225 P.3d 973 (2010). Here, Judge Stanhke was not the judge who presided over Gensitskiy's trial. Accordingly, there was no effect on whether Gensitskiy received a fair trial. Accordingly, Gensitskiy's appearance of fairness argument lacks merit.

A. NO STRUCTURAL ERROR

Gensitskiy argues that the ex parte communication should be considered structural error and, therefore, he should not be required to demonstrate actual and substantial prejudice in order to be entitled to relief on his petition. We disagree because the ex parte communication here does not undermine the reliability of the criminal trial. Furthermore, other types of ex parte communications are subject to harmless error analysis and are not treated as structural error. Therefore, this ex parte communication should not be considered structural error.

"Structural error is a special category of constitutional error that 'affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *State v. Wise*, 176 Wn.2d 1, 13-14, 288 P.3d 1113 (2012) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)) (alteration in original). "Where there is structural error 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" *Wise*, 176 Wn.2d at 14 (internal quotation marks omitted) (quoting *Fulminante*, 499 U.S. at 310). Structural errors are not subject to harmless error analysis and a defendant is not required to show specific prejudice to be entitled to relief. *Wise*, 176 Wn.2d at 14.

Moreover, in other contexts, such as improper ex parte communications between a judicial officer and the jury, our Supreme Court has held that "[a]lthough an improper communication between the court and the jury is an error of constitutional dimensions, the communication may be so inconsequential as to constitute harmless error." *State v. Bourgeois*, 133 Wn.2d 389, 407, 945 P.2d 1120 (1997) (citations omitted). Under this standard, the defendant must first raise the possibility that he or she was prejudiced by the improper communication. *Bourgeois*, 133 Wn.2d

at 407. Then the State bears the burden of showing that the error was harmless beyond a reasonable doubt. *Bourgeois*, 133 Wn.2d at 407.

Here, the jury book order does not undermine the reliability of the criminal trial because it did not affect the framework of the trial itself. The foundational framework of the criminal trial such as open voir dire of the jury and the presentation of evidence remained intact, and Gensitskiy makes no arguments regarding them. Accordingly, nothing about the jury book order interfered with the framework of the trial or rendered the proceeding fundamentally unfair.

And Gensitskiy presents no argument explaining why ex parte communications between judges and jurors should not be subject to a harmless error analysis, or why this ex parte communication, obtaining an order ex parte, should be considered differently from other types of ex parte communications. Therefore, we will not deviate from precedent and declare this ex parte communication to be structural error. Because the ex parte communication used to obtain the jury book order should not be considered structural error, Gensitskiy is required to demonstrate actual and substantial prejudice to be entitled to relief on his petition.

B. NO ACTUAL AND SUBSTANTIAL PREJUDICE

Gensitskiy claims that he has demonstrated actual and substantial prejudice because the State had the opportunity to perform additional background checks and internet searches regarding the potential jurors. However, this entire argument is based on speculation. Gensitskiy has not provided any evidence regarding what the State actually did with the jury book after obtaining it. Moreover, Gensitskiy has not provided any evidence supporting the contention that his defense was prejudiced by not having the jury book.

The only evidence regarding prejudice Gensitskiy has produced is Buckley's declaration stating that, if he had known Klein was going to obtain the jury book, he would have obtained the jury book as well. Because Buckley does not provide any facts as to what he would have done with the jury book, how having the jury book would have benefitted Gensitskiy's defense, or how Gensitskiy's defense was prejudiced by not having the jury book, there is no evidence of actual and substantial prejudice in the record before us. Accordingly, Gensitskiy has failed to meet his burden to show actual and substantial prejudice from the ex parte communication resulting in the jury book order.[3]

### III. PUBLIC TRIAL RIGHT

Gensitskiy also argues that his right to a public trial was violated when the trial court signed the jury book order without a public hearing. Obtaining the jury book order does not implicate the public trial right.

Both the United States Constitution and the Washington Constitution guarantee a criminal defendant the right to a public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. We review whether a defendant's right to a public trial has been violated de novo. *Wise*, 176 Wn.2d at 9.

To determine whether a defendant's public trial right has been violated, we engage in a three-part inquiry:

---

[3] Although we assume, without deciding that obtaining the jury book order ex parte was erroneous, we note that the best practice is to always provide notice to opposing parties to avoid ex parte contact with the court.

9

(1) Does the proceeding at issue implicate the public trial right?

(2) If so, was the proceeding closed? And

(3) If so, was the closure justified?

*State v. Smith*, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). "[N]ot every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public." *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). If we conclude that the right to a public trial does not apply to the proceeding at issue, we do not reach the second and third steps in the analysis. *Smith*, 181 Wn.2d at 519.

To determine whether the public trial right attaches, we apply the "experience and logic" test. *Sublett*, 176 Wn.2d at 72-73. Under the experience prong, we consider whether the proceeding at issue has historically been open to the public. *Sublett*, 176 Wn.2d at 73. Under the logic prong, we ask "'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press-Enter.Co. v. Superior Court of Calf.*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986). If both prongs are satisfied, the public trial right attaches. *Sublett*, 176 Wn.2d at 73.

Here, the experience prong indicates that the public trial right would not attach. Historically, not all aspects of jury selection implicate the public trial right. For example, the statutory or administrative dismissal of jurors does not implicate the public trial right. *See, e.g.*, *State v. Russell*, 183 Wn.2d 720, 730-31, 357 P.3d 38 (2015); *State v. Slert*, 181 Wn.2d 598, 604-08, 334 P.3d 1088 (2014); *State v. Wilson*, 174 Wn. App. 328, 331, 298 P.3d 148 (2013). The ex parte communication was simply to view the jury book and juror list. It was an administrative task that did not result in any action directly affecting the potential jurors. Because the jury book order

was administrative and did not interfere with the aspects of jury voir dire that historically take place in an open courtroom—questioning potential jurors in voir dire, making challenges for cause—the experience prong is not satisfied and the public trial right is not implicated. *See State v. Love*, 183 Wn.2d 598, 605-06, 354 P.3d 841 (2015) (for cause and peremptory challenges implicate the public trial right).

The logic prong also does not support concluding that the public trial right is implicated by an ex parte communication to view the jury book and juror list. Under the logic prong, we consider whether public access plays a significant positive role in the functioning of the particular process in question. Here, there is no indication that public access would influence the function of obtaining an order to view the jury book and the juror list because, from the record before us, jury book orders are routinely granted for clerical and administrative purposes, without argument, under a local court rule. Accordingly, the logic prong is not satisfied and obtaining the jury book order does not implicate the public trial right. Thus, Gensitskiy's public trial right was not violated.

## IV. RIGHT TO BE PRESENT

Gensitskiy also argues that his right to be present was violated when Klein submitted the jury book order ex parte for signature without his presence.

We review whether a defendant's constitutional right to be present was violated de novo. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). "A criminal defendant has a fundamental right to be present at all critical stages of a trial." *Irby*, 170 Wn.2d at 880. The right to be present attaches when a defendant's "'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Irby*, 170 Wn.2d at 881 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 2d 674 (1934)). However, "a

defendant does not have a right to be present when his or her 'presence would be useless, or the benefit but a shadow.'" *Irby*, 170 Wn.2d at 881 (quoting *Snyder*, 291 U.S. at 106-07). For example, a defendant does not have the right to be present during in-chambers conferences between the court and counsel on legal or ministerial matters. *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 484, 965 P.2d 593 (1998).

Obtaining the jury book order was not a critical stage of the proceeding. As has already been discussed, the jury book order was an order that was obtained without argument for administrative purposes. This type of order falls within the scope of "ministerial" matters at which a defendant does not have the right to be present. Accordingly, Gensitskiy's right to be present was not violated.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

We apply the same prejudice standard to ineffective assistance of counsel claims brought in a PRP as we do on appeal. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). To prevail on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Our scrutiny of counsel's performance is highly deferential; there is a strong presumption of reasonableness. *McFarland*, 127 Wn.2d at 335. To rebut this presumption, a defendant bears the burden of establishing the absence of any conceivable trial tactic explaining counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

To establish prejudice, a defendant must show a reasonable probability that the outcome of the trial would have differed absent the deficient performance. *Grier*, 171 Wn.2d at 34. If a defendant fails to establish either deficient performance or prejudice, the ineffective assistance of counsel claim fails. *Strickland*, 466 U.S. at 697.

A. TRIAL COUNSEL

1. Motion to Sever

Gensitskiy claims that he received ineffective assistance of counsel because his trial counsel did not make a motion to sever the charges for trial. Gensitskiy's ineffective assistance of counsel claim fails because he cannot show deficient performance. By having only one trial, rather than separate trials for each victim, Gensitskiy had the benefit of the jury hearing some of the victims recant and doubt their testimony, and the jury could weigh that testimony against the testimony presented by the other victims. If Gensitskiy had separate trials for each victim, then Gensitskiy would not have been able to rely on the recantations to challenge the strength of the State's evidence. Therefore, there was a legitimate trial tactic justifying trial counsel's decision not to bring a motion to sever the trials.

Because there was a legitimate trial tactic for counsel's decision, Gensitskiy cannot meet his burden to establish deficient performance. Accordingly, Gensitskiy's ineffective assistance of counsel claim based on the failure to bring a motion to sever fails.

2. Failure to Object to Haley's Testimony

Gensitskiy also argues that his trial counsel was ineffective for failing to object to Haley's expert testimony. To establish prejudice, a defendant must show a reasonable probability that the outcome of the trial would have differed absent the deficient performance. *Grier*, 171 Wn.2d at 34. Here, any prejudice was cured when Haley testified that she did not ascertain whether the allegations were accurate. In fact, Haley testified that she was not determining whether the disclosures or allegations were true or not.

Because Haley testified that she was not determining whether the allegations CSG made were true, the jury could not have viewed her testimony as an improper comment on the credibility of CSG's allegations. Accordingly, there is not a reasonable probability that the outcome of the trial would have differed if trial counsel had objected to Haley's testimony. Gensitskiy has failed to meet his burden to show prejudice in his ineffective assistance of counsel claim based on trial counsel's failure to object to Haley's testimony and his claim fails.

B. APPELLATE COUNSEL

To prevail on an ineffective assistance of appellate counsel claim, a petitioner must show that (1) the legal issue appellate counsel failed to raise had merit and (2) petitioner was actually prejudiced by the failure to raise or adequately raise the issue. *In re Pers. Restraint of Dalluge*, 152 Wn.2d 772, 787, 100 P.3d 279 (2004). A petitioner can show that he was actually prejudiced if he can show that but for his appellate counsel's unreasonable failure to raise the issue, he would have prevailed on his appeal. *Dalluge*, 152 Wn.2d at 787-88.

14

1.  Failure to Assign Error to the Jury Book Order

Gensitskiy argues that he received ineffective assistance of appellate counsel because his appellate counsel failed to assign error to the jury book order.  Although Gensitskiy raises three separate issues regarding the jury book order in his PRP, he appears to rely on the alleged public trial right violation to support his claim that he received ineffective assistance of appellate counsel.  Because the public trial right was not implicated by the court granting the jury book order, Gensitskiy cannot meet his burden to show that the issue would have had merit on direct appeal. *Dalluge*, 152 Wn.2d at 787.  Thus, Gensitskiy's ineffective assistance of appellant counsel claim fails. *Dalluge*, 152 Wn.2d at 787-88.

Similarly, an ineffective assistance of appellate counsel claim based on the violation of his right to be present would fail because the jury book order was not a violation of his right to be present.  Therefore, that issue also would not have had merit on direct appeal.

Finally, Gensitskiy does not show that he was actually prejudiced by appellate counsel's failure to raise on direct appeal the issue related to the jury book order. *Dalluge*, 152 Wn.2d at 787-88.

Ex parte communications between judicial officers and jurors have been subject to the harmless error analysis. *Bourgeois*, 133 Wn.2d at 407.  Gensitskiy has not presented any argument to support deviating from this precedent.  And, as explained above, we do not consider the jury book order a structural error.  Therefore, if Gensitskiy's appellate counsel had raised the issue related to the jury book order on direct appeal, Gensitskiy would have had to raise the possibility that he was prejudiced by the error. *Bourgeois*, 133 Wn.2d at 407.  Gensitskiy has not presented any facts from the direct appeal record that would indicate he was prejudiced by the jury book

order. We do not consider evidence outside the record on direct appeal, therefore, we would have determined that the jury book order was harmless error. *McFarland*, 127 Wn.2d at 335. Accordingly, Gensitskiy has failed to show that he would have prevailed on his direct appeal if his appellate counsel had raised the issue regarding the jury book order. Gensitskiy's ineffective assistance of appellate counsel claim based on the jury book order fails.

2. Failure to Assign Error to Haley's Testimony

Gensitskiy also argues that his appellate counsel was ineffective for failing to assign error to Haley's allegedly improper opinion testimony on direct appeal. However, on direct appeal, the allegedly improper portions of Haley's opinion testimony would have been subject to the constitutional harmless error standard. *State v. Quaale*, 182 Wn.2d 191, 201-02, 340 P.3d 213 (2014).

"Constitutional error is harmless only if the State establishes beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error." *Quaale*, 182 Wn.2d at 202. Here, Haley testified that she was not determining the truth of the allegations CSG made. Because Haley stated that she did not determine the truth of CSG's allegations, no reasonable jury would have relied on Haley's testimony as an opinion on CSG's credibility. Accordingly, any reasonable jury would have reached the same result absent the error and thus, the error was harmless. Because the error was harmless, Gensitskiy would not have prevailed if the issue had been raised by appellate counsel on direct appeal; he has failed to show prejudice and his ineffective assistance of appellate counsel claim fails.

16

No. 49044-7-II

Accordingly, we deny Gensitskiy's petition for relief.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Sutton, J._

SUTTON, J.

We concur:

_Maxa, C.J._

MAXA, C.J.

_Johanson, J._

JOHANSON, J.